William RALPH, Appellant,

v.

Vernon L. PEPERSACK, Warden, Maryland State Penitentiary, Appellee.

No. 9176.

United States Court of Appeals Fourth Circuit.

Argued Jan. 14, 1964.

Decided July 16, 1964.

Edward L. Genn, Washington, D. C., Court-assigned counsel (Lawrence Speiser, Washington, D. C., Court-assigned counsel, on brief), for appellant.

Robert F. Sweeney, Asst. Atty. Gen. of Maryland (Thomas B. Finan, Atty. Gen. of Maryland, on brief), for appellee.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and BARKSDALE, District Judge.

BOREMAN, Circuit Judge:

Appellant, William Ralph, was convicted of rape and sentenced to death by three judges of the Circuit Court of Montgomery County, Maryland, sitting

without a jury. His conviction was affirmed by the Maryland Court of Appeals [1] and the United States Supreme Court denied certiorari. [2] Ralph then filed in the United States District Court for the District of Maryland a petition for a writ of habeas corpus. The District Court entered an order staying further proceedings on the petition and granted a stay of execution to permit Ralph to exhaust state remedies by pursuing the procedures available in the Maryland courts for post-conviction relief. [3] After proceeding unsuccessfully in the courts of Maryland, Ralph renewed his petition in the Maryland District Court which denied the petition after a full hearing and after considering the transcript of the state proceeding. [4] On this appeal Ralph challenges the legality of his arrest and detention and the admissibility at trial of an alleged oral confession. We think it necessary to set forth rather fully the pertinent facts.

In the early morning of March 21, 1960, the Police Department of Montgomery County, Maryland, received a report of a breaking, entering, rape and sodomy in Kensington, Maryland. The victim of the crimes furnished the Montgomery County Police with a general description of her assailant and, as a result thereof, they sent a telegraphic message or "lookout" to the Metropolitan Police Department of the District of Columbia describing the suspect as a colored male, age 25 to 40, height five feet ten inches, weight 155 pounds, with very thick lips, muscular chest, close cropped kinky hair, wearing a zipper jacket, possibly leather. The report also noted that an automobile foreign to the area was observed at about the time of the crime and described the vehicle as a 1956 Oldsmobile with green body and white top, registration unknown.

Three days later, on March 24, 1960, the Montgomery County Police received a report of an entry, assault and attempted rape in Chevy Chase, Maryland. The victim of the attempted rape described her assailant as a colored male, 28 to 32 years old, height five feet eight inches to five feet ten inches, weight 165–170, having a medium brown complexion, thick lips, thin mustache, short kinky black hair, stocky build and a barrel chest. This description, like that of the suspect in the Kensington crimes, was sent by telegraphic message to the Metropolitan Police Department of the District of Columbia, and reference was again made to the earlier message of March 21. The Montgomery County police report noted the similarity of the description of the Chevy Chase assailant to that given by the victim of the Kensington crimes.

The above "lookout notices" were read at a number of roll calls at the Eighth Precinct Station of the Metropolitan Police. Significantly, they were read in their entirety at the 11 P.M. roll call of March 25.

At 2:55 A.M. on March 26, about four hours after the notices were last read, officers of the Eighth Precinct received a report of a woman screaming in a wooded area in the 2700 block of Macomb Street in the District of Columbia. A patrol car was notified of the report and proceeded to the area within a few minutes. Upon arriving in the vicinity the two officers in the patrol car, Williams and Donahue, saw only Ralph. He was standing beside an Oldsmobile with a green body and white top adjusting his clothing in some manner (seemingly attempting to pull a sweater over his head) and as the patrol car approached he entered the automobile. He was apparently placed under arrest almost immediately and a call was sent in for the Sex Squad. Officers of the Sex Squad arrived within a few minutes and directed that Ralph be taken to the Eighth Precinct Station. Two Montgomery County traffic violation

1. Ralph v. Maryland, 226 Md. 480, 174 A.2d 163 (1961).

2. 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962).

3. Ralph v. Pepersack, 203 F.Supp. 752 (D.Md.1962).

4. 218 F.Supp. 932 (1963).

tickets were taken from Ralph's person and a search of the car revealed Maryland license plates and some nontaxpaid whiskey.

Ralph arrived at the precinct station shortly before 3:30 A.M. and was "booked." The Montgomery County Police were notified of Ralph's arrest and Sergeant Leahey of that department was sent to the Eighth Precinct Station. Leahey was apprised of the investigation and made arrangements for one of the victims of the Maryland crimes to come to Police Headquarters later in the morning. Ralph was questioned for about forty-five minutes by members of the Metropolitan Police Department concerning his activities of that night and his possession of the nontaxpaid whiskey. He stated that he had stolen wine and beer from his employer which he had traded for the whiskey. Sergeant Leahy observed some of the interrogation but did not participate in the questioning. During the time that Ralph was being questioned about his activities in the District of Columbia, the Metropolitan Police received a report of a rape and sodomy which had been committed by a colored male in the wooded area in the 2700 block of Macomb Street where, a few minutes after the screams had been reported, Ralph had been apprehended. The interrogation of Ralph at the Eighth Precinct Station continued intermittently until approximately 6:00 A.M., apparently centering around the rape which had occurred near Macomb Street. Ralph was placed in a lineup and viewed by the victim of the District of Columbia crime. He denied any knowledge of that offense and the victim was apparently unable to identify him.

At approximately 6:00 A.M. on the morning of his arrest, Ralph was taken from the Eighth Precinct Station to the Metropolitan Police Headquarters, arriving there at about 6:45 A.M. after stopping briefly at an address where he claimed to be living. He was then given something to eat and taken to the Identification Bureau. From approximately

7:30 A.M. until 9:56 A.M., Ralph was questioned in the polygraph room of the Metropolitan Police Headquarters by Lieutenant Eichelberger of the Metropolitan Police Department. During that time he consented to and was given a polygraph examination. The questioning and the polygraph examination related to the Macomb Street rape of the same morning. Ralph is alleged to have confessed at 9:40 A.M. to committing that offense.

After a brief recess at about 10 A.M., during which Ralph was taken to a second lineup, questioning by Lieutenant Eichelberger was resumed. The victim of the Kensington crimes, a Mrs. Peck, and Lieutenant Whalen, the officer in charge of the Montgomery County investigation, arrived at Headquarters shortly after 10:30 A.M. and conferred briefly with Lieutenant Eichelberger. At about 10:50 on the morning of Ralph's arrest, the interrogation first turned to the rape in Kensington, Maryland. Ralph is alleged to have confessed to the commission of that offense shortly after 11:00 in the presence of Lieutenant Eichelberger, Lieutenant Whalen of the Montgomery County Police and the victim, Mrs. Peck. At 11:38 he was taken before a magistrate for a preliminary hearing in connection with the District of Columbia crime. Shortly thereafter he was extradited to Maryland where he was subsequently tried for the Kensington rape. His alleged oral confession was admitted in evidence at his trial; he was convicted and sentenced to death.

Ralph attacks the admission in evidence of his confession on a number of grounds. Principally, he contends that his confession was inadmissible because it was the product of an illegal arrest and because it was obtained after an unnecessary delay by federal officers in charging him before a magistrate.

It should be noted at the outset that the power of a federal court to review on habeas corpus a state court proceeding is strictly limited. This court has no general supervisory powers over state courts and our inquiry must be con-

fined to determining whether, in the circumstances here, the admission of Ralph's oral confession into evidence at trial constituted a denial of due process of law. See Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951). Of course, in deciding this question we are not bound by the state court's conclusion and, indeed, must make an independent determination of that issue. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Ashcraft v. Tennessee, 322 U.S. 143, 147–148, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

Ralph contends that his arrest was illegal in that (1) it was without probable cause, and (2) it was an arrest merely for investigation. These contentions were treated separately in the brief and oral argument of the appellant and we shall so consider them here.

 We turn first to the question of probable cause for arrest. The existence of "probable cause" is to be determined by the application of a practical, not a technical, standard. The meaning of the phrase has been so frequently stated as to require little elaboration here. See, e. g., Kerr v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. Peisner, 311 F.2d 94, 104 (4 Cir. 1962). Probable cause is something more than mere suspicion and something less than evidence which would justify a conviction.[5] The essence of all definitions of probable

cause for arrest is reasonable ground for belief that a crime has been committed and that the person arrested committed it. Brinegar v. United States, supra, 338 U.S. at 175–176, 69 S.Ct. 1302, 93 L. Ed. 1879; Carroll v. United States, supra, 267 U.S. at 161, 45 S.Ct. 280, 69 L. Ed. 543. However, in determining the existence of probable cause a standard is much more easily stated than applied. No single litmus-paper test will provide the answer when probable cause is at issue; we look instead to the totality of the circumstances. And the pertinent circumstances are those of the moment, the actual ones, the ones that confronted the arresting officers. Officers patrolling the street at night do not prearrange the setting and they cannot judge events in the calm of an office. Things just happen, and as they happen the officers must choose to act or not. Our inquiry is whether their action was that of reasonable and prudent police officers in view of the circumstances as they appeared at the time of arrest. We think the circumstances existing on the early morning of March 26, 1960, were such as to justify reasonable, cautious and prudent police officers in proceeding as did officers Donahue and Williams.

Reviewing the facts we note that the officers received the report of a woman screaming in the 2700 block of Macomb Street and they proceeded immediately to the area. It was after three o'clock in the morning. Ralph was the only person in sight. He was adjusting his clothing. Only a short time before, the lookout notices from Montgomery County, Maryland, had been read to the officers. They knew that crimes had been committed. Due to the proximity of Montgomery

5. One of the earliest explanations of the Fourth Amendment requirement of probable cause is the statement by Chief Justice Marshall sitting as a committing magistrate in connection with the proceedings against Aaron Burr:

"On an application of this kind I certainly should not require that proof which would be necessary to convict the person to be committed, on a trial in chief; nor should I even require that which should absolutely convince

my own mind of the guilt of the accused: but I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it."

United States v. Burr, 25 Fed.Cas. 2, 12 (No. 14,692a) (C.C.D.Va.1807).

County to the District of Columbia, and particularly the Eighth Precinct,[6] it was not unreasonable to believe that the offender might be found in their jurisdiction. When they saw Ralph they noticed that he fitted the description of the wanted man. They noticed that he was driving an automobile the make and colors of which matched the description of the automobile contained in one of the lookout notices. They knew that only a few minutes before a woman had been reported screaming in that area. When all of these circumstances are considered we think it manifest that there were at the time of arrest reasonable grounds for belief that Ralph had committed the Montgomery County crimes. In our opinion there was probable cause for his arrest. In view of this conclusion, we need not determine whether the lack of probable cause to make the arrest is enough to render inadmissible in a state court an otherwise voluntary confession made while under arrest.

The testimony concerning the nature of the arrest, i. e., whether it was an arrest for "investigation," is somewhat conflicting and ambiguous. For example, on direct examination at the habeas corpus hearing held in the District Court, Officer Williams, one of the two arresting officers, testified as follows:

"Q. Did you arrest him immediately as you arrived on the scene?

"A. Yes, sir.

"Q. What did you arrest him for?

"A. Well, the investigation.

"Q. And what were you investigating, sir?

"A. We received a radio call from the dispatcher to investigate a woman screaming in that particular block.

\* \* \* \* \* \*

"Q. And based upon that information, sir, you say you arrested Mr. Ralph for investigation?

"A. Yes.

"Q. Is that correct?

"A. Yes."

In response to questioning on cross-examination, however, Officer Williams testified:

"Q. Now, you have previously testified that you had been advised by the roll call for several days that the Maryland Police wanted a suspect of a certain description driving a 1954 Oldsmobile on suspicion of rape and sodomy and housebreaking. Did you have any reason to believe that the defendant at the time you saw him fitted that description or was the person who was wanted by the Maryland Police on this charge?

\* \* \* \* \* \*

"THE WITNESS: Yes, sir.

"THE COURT: What reasons?

"THE WITNESS: Well, the fact that he was a Negro male and he was operating an Oldsmobile with a green bottom and a white top, which had been received in the roll call and the proximity of the crime in relation to the Eighth Precinct, and when I particularly noticed the subject and the automobile, that's the first thing that I thought of.

\* \* \* \* \* \*

"Q. For investigation of what crime did you take Ralph into custody?

"A. For investigation of a crime that had been committed by a Negro male in Montgomery County. I understand, I think, the charges were burglary, rape and sodomy."

 It may be, as Ralph asserts, that the preponderance of the testimony indicates that he was arrested for "investigation"[7] but the District Court

6. Montgomery County, Maryland, borders the Eighth Precinct of the District of Columbia.

7. Officer Donahue, the other arresting officer, did not testify in the habeas corpus proceeding. His testimony at the trial

made no specific finding in this respect and we do not consider a determination of that issue decisive of the question before the court. We reiterate, our inquiry is a constitutional one, that is, whether the admission in evidence of Ralph's confession constituted a denial of due process of law. To make constitutional questions turn on the term chosen by police officers to describe their activity—officers who are accustomed to the vernacular of the police station and unschooled in the accepted constitutional vocabulary—is to engage in a futile and unwarranted exercise in semantics. Here, it appears that Ralph was arrested because his description and that of his car matched that of the wanted perpetrator of the Montgomery County crimes of which the officers had been informed only a short time before.[8] We have held that there was probable cause for his arrest for those crimes. We think untenable the proposition that an arrest based on probable cause becomes unconstitutional because described by an officer as an arrest for "investigation." In support of his argument to the contrary, Ralph relies principally upon the decision of the Court of Appeals for the Fifth Circuit in Staples v. United States, 320 F.2d 817 (1963).

In Staples, the two defendants, McNamara and Staples, in the language of the court, had been "arrested and booked for 'investigation of passing counterfeit notes.'" Their motel room and an automobile owned by McNamara were searched without a warrant and without probable cause. At their trial evidence obtained as a result of the searches was introduced and they were convicted, *inter alia*, of uttering counterfeit United States notes. On appeal, the Government sought to justify the searches as incident to lawful arrests. The Court of Appeals rejected the Government's contention as to the search of the automobile, pointing out that that search was not *incident* to the arrest of the defendant McNamara, his arrest having occurred at a place removed from the automobile, and that "McNamara was not under *lawful* arrest, but had been booked for 'investigation of passing counterfeit notes.'" The search of the motel room was clearly incident to the arrest of Staples and the court recognized that there might have been probable cause for his arrest but, neverthe-

does not indicate explicitly the reason for Ralph's arrest although he did state that he "noticed the car fit the description of teletype we had gotten at 11:00 o'clock roll call for the rape in Montgomery County." Captain O'Connell of the Metropolitan Police Department arrived at the Macomb Street scene a few minutes after Ralph had been arrested. At the hearing in the District Court he testified as follows concerning the arrest:

"Q. In this particular case, was he arrested for investigation; is that correct?

"A. When I arrived at the scene my first conversation was with Officer Donahue, and Officer Donahue informed me, and I could observe the petitioner in the rear seat of Scout 83, that they had placed under arrest a suspect in the Maryland cases that I had emphasized at roll call that night."

The testimony of Officer Hall, one of the members of the Sex Squad who arrived at the scene shortly after Ralph was arrested, is also to the effect that the arresting officers told him they had apprehended a suspect in the Montgomery County cases. The only testimony as to how Ralph was initially booked is that of Officer Hall to the effect that he was booked on an "open charge." Although he did not indicate the charge on which Ralph was booked, Captain O'Connell testified at trial that it was not uncommon in the District of Columbia to arrest for "investigation" and book on an "open charge."

8. Ralph has emphasized the statement in the opinion of the Circuit Court of Montgomery County that "he was not apprehended for the offense for which he is being tried at the present time." However, the court was not dealing with the question of probable cause for arrest and the issue as to the offense for which Ralph had been arrested was not presented to the court. Its statement, considered in context, cannot be deemed controlling here. In any event, the record clearly indicates that Ralph was arrested for the Maryland crimes.

less, held the arrest unlawful and the evidence seized from the motel inadmissible. At 320 F.2d 821, the court stated:

" * * * All of this information may have been sufficient to support a reasonable belief of the officers that Staples was a guilty participant in the passing of the counterfeit bills.

"Whether the officers actually entertained such a belief is questionable in view of the fact that instead of arresting Staples on a legal charge, they arrested him simply for investigation. As heretofore indicated, that was not a lawful arrest. It follows that the evidence found in the motel room should have been suppressed as against Staples."

The Staples case can be distinguished from the case at bar on several grounds: (1) A statute of the State of Florida, the state where the defendants were arrested, required officers making arrests without warrants to inform the person arrested of the cause of arrest; (2) in Staples, the defendants were tried in a federal court for violations of federal law; and (3) the case did not deal with the question whether a confession made by a prisoner under illegal arrest is inadmissible. The searches involved in Staples having been made without warrants and without probable cause were clearly illegal unless incident to lawful arrests. Thus, the evidence obtained from the searches was not held inadmissible as the product of an *unlawful arrest;* the court held only that evidence which was otherwise inadmissible could not be rendered admissible by an invalid arrest. In view of the differentiations, the Staples case can hardly be considered strong support for Ralph's position. Insofar as Staples may be read as indicating that an arrest on probable cause is rendered unconstitutional because it is termed an arrest for investigation, we do not choose to follow it.

■ ■ Not only was Ralph's arrest constitutionally sound but we think it was lawful under the laws of the District of Columbia as well. It is settled that the law of the place of the arrest determines its validity. See Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Seawell v. United States, 243 F.2d 909 (4 Cir. 1957). At the time of Ralph's arrest, the District of Columbia had no statute or ordinance prohibiting arrests for investigation where probable cause was present. The proposition as now urged by Ralph was considered and rejected by the Court of Appeals for the District of Columbia in Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82, 86, cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958). There, Judge Prettyman, speaking for the court, stated:

"At the trial in the case at bar, in answer to the question, 'And for what offense were they being arrested at that time?', the officer testified, 'Investigation of housebreaking.' Of course there is no such crime as 'investigation'. But this description given by the officer does not go to the question of probable cause. *The question is not what name the officer attached to his action; it is whether, in the situation in which he found himself, he had reasonable ground to believe a felony had been committed and that the men in the car had committed it. * * *"* (Emphasis added.)

■ The District of Columbia has recently adopted a policy of prohibiting arrests for investigation [9] and it has been suggested by a Federal District Court in the District of Columbia that, notwithstanding the existence of probable cause, such arrests may be illegal. United States v. Killough, 193 F.Supp. 905 (1961), rev'd on other grounds 315 F.2d

---

9. See Memorandum Order No. 15, Series, 1963, of the Commissioners of the District of Columbia, February 28, 1963.

See also Kamisar, Book Review, 76 Harv.L.Rev. 1502 (1963).

241 (D.C.Cir. 1962).[10] However, we have found no decision of the Court of Appeals for the District of Columbia Circuit which indicates a departure from the Bell case and we accept that decision as stating the law of the District of Columbia at the time of Ralph's arrest. Moreover, although we need not decide whether an arrest without probable cause would render a voluntary confession inadmissible in a state court,[11] we are convinced that the admission of such a confession does not offend due process merely because the arrest was defective in some technical respect. There is significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule or some other nonconstitutional mandate. The protection against arrest without probable cause, as well as that against unreasonable searches and seizures, stems directly from the Fourth Amendment. There is no such constitutional prohibition against arrests for investigation where probable cause exists. Certainly not every official impropriety gives rise to a finding that due process has been denied. Thus, regardless of the prop-

10. In the Killough case, after pointing out that the defendant had been arrested for "investigation" and booked and held on the charge of "suspicion," the District Court stated:

"If the police did, in fact, have probable cause to arrest defendant for homicide on the morning of the 24th of October, that is the charge which should have been lodged against him. The charge being an illegal one, the custody was illegal, and there is great probability that a confession procured from one in unlawful custody—even where there is no delay in arraignment—is equally to be suppressed as a confession procured during a period of unlawful delay from one legally arrested. * * * "

11. The recent Supreme Court decision in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), may be read as suggesting that an otherwise voluntary confession will be inadmissible in a federal court if found to be the "fruit" of an arrest without probable cause. See Gatlin v. United States, 326 F.2d 666 (D.C.Cir. 1963); cf. United States v. Meachum, 197 F.Supp. 803 (D. D.C.1961); United States v. Killough, 193 F.Supp. 905 (D.D.C.1961).

In Wong Sun the petitioner had been arrested without probable cause but had been released on his own recognizance and voluntarily returned several days later to make a statement implicating himself in narcotics violations. The Court held that in these circumstances his confession was not rendered inadmissible by the unlawful arrest but intimated that had he remained in custody the result would have been different. At 371 U.S. 491, 83 S.Ct. 419, the Court stated:

"* * * We have no occasion to disagree with the finding of the Court of Appeals that his arrest, also, was without probable cause or reasonable grounds. At all events no evidentiary consequences turn upon that question. For Wong Sun's unsigned confession was not the fruit of that arrest, and was therefore properly admitted at trial. On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.' * * * "

Prior to the Wong Sun decision, a number of federal courts had held that an arrest without probable cause did not, in itself, render a confession inadmissible in the federal courts. See, e. g., Dailey v. United States, 261 F.2d 870 (5 Cir. 1958), cert. denied, 359 U.S. 969, 79 S.Ct. 881, 3 L.Ed.2d 836 (1959); Smith v. United States, 254 F.2d 751 (D.C.Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958); United States v. Walker, 197 F.2d 287 (2 Cir.), cert. denied, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679 (1952). And, notably, the Maryland Court of Appeals has held, subsequent to the decision in Wong Sun, that an otherwise voluntary confession is not rendered inadmissible in the courts of that state because the arrest was unlawful. See Peal v. State, 232 Md. 329, 193 A.2d 53 (1963); Stewart v. State, 232 Md. 318, 193 A.2d 40 (1963); Prescoe v. State, 231 Md. 486, 191 A.2d 226 (1963).

riety of arrests for investigation [12]—and certainly we do not condone the practice—we think it clear that a voluntary confession is not rendered inadmissible in a state court because the defendant was arrested in some other jurisdiction for "investigation." [13]

Also without merit, we think, is Ralph's contention that his confession was inadmissible under the doctrine of the McNabb, Upshaw and Mallory cases [14] because obtained after an *unnecessary* delay by federal officers in presenting him to a magistrate in violation of Rule 5(a) of the Federal Rules of Criminal Procedure. There are two compelling answers to his contention.

 First, Rule 5(a) does not proscribe all delay but only that which is "unnecessary." [15] The term "unnecessary" suggests an element of flexibility within the rule itself and the policy underlying McNabb, Upshaw, Mallory and other decisions giving effect to the exclusionary doctrine "does not call for mechanical or automatic obedience." Mallory v. United States, 354 U.S. at 455, 77 S.Ct. at 1359, 1 L.Ed.2d 1479. What is "unnecessary" delay must depend upon the peculiar facts of the case. See United States v. Vita, 294 F.2d 524 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed. 788 (1962); Goldsmith v. United States, 277 F.2d 335 (D.C.Cir.), cert. denied sub nom., 364 U.S. 863, 81 S. Ct. 106, 5 L.Ed.2d 86 (1960). It must be remembered also that neither the Mc-Nabb-Mallory rule nor any decision of the Supreme Court prohibits interrogation *per se.* Rather, interrogation has consistently been recognized as a vital function of law enforcement agencies which may result as well in release of the innocent as detention of the guilty.[16] Even

---

12. The objections to the practice of arresting for investigation are well stated in Report and Recommendations of the Commissioners' Committee on Police Arrests for Investigation (D.C.1962). Notably, the practice of the police to arrest for investigation *may* result in arrests without probable cause; it may result in a failure to apprise the person arrested of the crime with which he is charged; it may result in failure within a reasonable time to take the person arrested before a magistrate; and, it may result in incommunicado detention without the opportunity for bail. See Report, supra at 42–47. The evils which are assigned, however, are possible but not necessary consequences of an arrest which is described by police officers as an "arrest for investigation." That some or all of the consequences may follow from such arrests would not appear to be a sufficient justification for finding a denial of due process in a particular case when, in fact, such consequences are absent.

13. Our conclusion in this regard is strengthened by the fact that, insofar as we are advised, the Supreme Court has not held a confession inadmissible on this ground although it has dealt with the admissibility of confessions in a number of cases where the defendant had apparently been arrested for investigation. See Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); cf. United States v. Di Re, 332 U.S. 581, 588–592, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

14. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948); Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

15. Rule 5(a) provides as follows:
 "(a) **Appearance before the Commissioner.** An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith."

16. As pointed out by Justice Frankfurter in Culombe v. Connecticut, 367 U.S. 568, 571, 81 S.Ct. 1861 (1961):
 "* * * Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent

the briefest experience with criminal jurisprudence teaches that the plainly innocent as well as the guilty may be found in incriminating circumstances. Unquestionably, the police often arrest on probable cause persons who, upon a very brief inquiry, will be revealed as completely innocent. For example, notwithstanding the existence of probable cause for arrest, the suspect may offer an alibi or an explanation of his conduct which is capable of ready verification and which, if true, convincingly demonstrates his innocence. Certainly, the obviously innocent are entitled to the benefit of some further inquiry *before* being formally charged. Indeed, the Mallory decision itself recognized this possibility.[17] Often, however, the circumstances are more complex and more than a brief inquiry may be required before an explanation or alibi can be verified or refuted or the circumstances explored. Such a case is the case at hand. The decision of the police officers is a difficult one. Unless every person arrested on probable cause is to be immediately charged without inquiry further than is possible at the time of arrest, the officers must choose between presenting and charging the suspect and risking irreparable injury to an innocent person or releasing the prisoner and possibly freeing the guilty one. We think the police should not be compelled to make this choice prematurely, without the benefit of information which a reasonable inquiry would provide.

Of course the balance between permissible and impermissible interrogation and detention is a delicate one. Certainly, the police should not be permitted, before taking the suspect before a magistrate, to engage in lengthy interrogation or to resort to "third degree methods" which are calculated to elicit damaging and incriminating statements. Just as surely, reasonable inquiry should not be prohibited. Whether the detention is necessary and the interrogation reasonable can only be determined in the factual context of a particular case. Here, the District Court determined that the delay in presenting Ralph to the magistrate was necessary and the continuing inquiry justified by the circumstances. We think that determination is amply supported by the record.

Ralph was arrested because there was probable cause to believe that he had committed felonies in Montgomery County, Maryland. The Montgomery County Police were contacted immediately upon Ralph's arrival at the Eighth Precinct

human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.

"The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death. In any event, whatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths."

Other cases have with equal force emphasized the necessity of interrogation to proper and effective law enforcement. See, e. g., Haynes v. Washington, 373 U.S. 503, 514, 83 S.Ct. 1336, 10 L. Ed.2d 513 (1963); United States v. Vita, 294 F.2d 524, 532 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); Trilling v. United States, 104 U.S.App.D.C. 159, 260 F. 2d 677, 700–701 (D.C.Cir. 1958) (opinion by Judge Prettyman).

17. At 354 U.S. 455, 77 S.Ct. 1360, the Court stated that "[c]ircumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties."

Station and Sergeant Leahey of that department was sent to aid in the investigation. Ralph denied any wrongdoing. The only witnesses to the Montgomery County crimes were the victims. Sergeant Leahey made arrangements for the victim of the Kensington crimes, Mrs. Peck, to come to the Metropolitan Police headquarters to view Ralph.

In the circumstances it was reasonable and necessary to hold Ralph in custody until Mrs. Peck could, with reasonable dispatch, come to the station and attempt to identify him. See Goldsmith v. United States, 107 U.S.App.D.C. 305, 277 F.2d 335 (D.C.Cir. 1960). Had she been able to positively identify him as her assailant, he should have been formally charged immediately. If, on the other hand, she could say with certainty that he *was not* the person who attacked her and had not other circumstances justifying his detention developed,[18] he should then have been released. Confrontation by the only witness to the crime for which he was convicted presented the most expeditious, probably the most reliable and perhaps the only, means of determining whether Ralph was telling the truth. The Montgomery County Police were also entitled to a reasonable opportunity to interview Ralph in connection with the Maryland crimes. Immediately after the interview in which Mrs. Peck and the Montgomery County Police participated, Ralph was taken before a magistrate. We conclude that there was no "unnecessary" delay and Rule 5(a), even if applicable, was not violated.

 The second, and more fundamental, answer to Ralph's contention is that neither Rule 5(a) nor the McNabb-Mallory rule is applicable to criminal prosecutions in the state courts.

That Rule 5(a) has no application to state court proceedings is, of course, ob-

vious. We think it equally apparent that the McNabb-Mallory rule, as originally conceived, is not a limitation which derives from the Constitution and which inheres in the Due Process Clause of the Fourteenth Amendment. The Court in McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 86 L.Ed. 1736 (1943), made it abundantly clear that the exclusionary rule was not based upon a constitutional foundation but was instead a rule of evidence formulated under the supervisory authority of the Court over "the administration of criminal justice in the federal courts." Subsequent decisions make it manifest that the rule has not been elevated to a constitutional basis and that the due process clause does not require the exclusion in a state court of a *voluntary* confession because the defendant was not promptly taken before a magistrate. Thus, in Gallegos v. Nebraska, 342 U.S. 55, 63–64, 72 S.Ct. 141, 146–147, 96 L.Ed. 86 (1951), the Court stated:

> " * * * The rule of the McNabb case, considered recently in United States v. Carignan, 342 U.S. 36 [72 S.Ct. 97, 96 L.Ed. 48], is not a limitation imposed by the Due Process Clause. * * * Compliance with the McNabb rule is required in federal courts by this Court through its power of supervision over the procedure and practices of federal courts in the trial of criminal cases. That power over state criminal trials is not vested in this Court. A confession can be declared inadmissible in a state criminal trial by this Court only when the circumstances under which it is. received violate those 'fundamental principles of liberty and justice' protected by the Fourteenth Amendment against infraction by any state."

---

18. Although Ralph argues otherwise, we think it obvious that circumstances which developed after his arrest, such as the report of the rape in the area where he was arrested and the discovery of Maryland license plates and Montgomery County traffic tickets, furnished reasonable ground for his continued detention.

Again, in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), decided on the same day as Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961),[19] the Court emphasized that compliance with the Mc-Nabb rule cannot be deemed a requisite of due process:

"The McNabb case was an innovation which derived from our concern and responsibility for fair modes of criminal proceeding in the federal courts. The States, in the large, have not adopted a similar exclusionary principle. And although we adhere unreservedly to McNabb for federal criminal cases, we have not extended its rule to state prosecutions as a requirement of the Fourteenth Amendment."

Id. at 600–601, 81 S.Ct. 1860, 6 L.Ed.2d 1037. Accord, Brown v. Allen, 344 U.S. 443, 476, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Stroble v. California, 343 U.S. 181, 197, 72 S.Ct. 599, 96 L.Ed. 872 (1952); Townsend v. Burke, 334 U.S. 736, 738, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).

■ Having determined that Ralph's arrest was lawful and that his confession was not rendered inadmissible because of the delay in presenting him to a magistrate, it remains for consideration whether his confession was in fact voluntary. If it was, if he willed to confess, it was properly admitted in evidence against him. If not, if his will had been overborne and his capacity for self-determination critically impaired, the use of his confession constituted a denial of due process.[20] The Circuit Court of Montgomery County and the Maryland Court of Appeals, as well as the court below, have determined, and we think justifiably so, that Ralph's confession was freely and voluntarily given.

Ralph testified at trial that he had been assaulted and otherwise mistreated by the police but his allegations in this respect were unequivocally denied by all of the officers who participated in the investigation and the trial court found that he had not been physically abused. This determination is amply supported by the record and is not seriously contested here. The record also fails to support the allegation that Ralph was either physically or mentally exhausted. The interrogation, although extending over a period of roughly eight hours, was intermittent and there were periods of respite. Ralph was given sustenance. Officers testified that he remained alert throughout the interrogation and was no more nervous than any person who is arrested and accused of crime. Aside from the length of the interrogation and the fact that he was not immediately taken before a magistrate, the record is barren of evidence which would indicate that his will had been overborne and his capacity for self-determination critically impaired. Although these factors are relevant to the issue of voluntariness, they are by no means controlling. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Circumstances often emphasized in cases involving coerced confession are lacking here. For example, it is not contended in this case that Ralph

19. In Mapp v. Ohio, the Supreme Court held that the Fourteenth Amendment prohibited the introduction of unconstitutionally seized evidence in a state criminal trial, thus overruling Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and extending the exclusionary doctrine of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), to state court proceedings.

20. Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

requested and was denied opportunity to contact counsel or friends (cf. Haynes v. Washington, supra; Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)); that he was subjected to extensive and relentless interrogation without rest (Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944)); that subtle psychiatric techniques were applied (Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954)); that there was an extended deprivation of sleep and food (Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958)); or that external pressures such as the threat of mob violence existed (Payne v. Arkansas, supra). Nor does this case involve an accused of tender age, as did Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L. Ed. 224 (1948), and Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), or a defendant of subnormal mental capacity as did Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), and Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

In short, from all of the surrounding circumstances, we conclude that Ralph's will was not subverted and that his confession was freely and voluntarily made. Hence, its admission at trial did not constitute a denial of due process.

Finally, Ralph contends that the imposition of the death penalty on a convicted rapist is "uncivilized conduct" and constitutes cruel and inhuman punishment where he has neither taken nor endangered the life of his victim. This proposition was recently mentioned and discussed by Justice Goldberg in dissenting from the majority decision denying certiorari in Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963), but we have found no Supreme Court decision to support Ralph's contention and we are not disposed to act favorably upon it.

For the reasons stated herein, the decision of the District Court is

Affirmed.