JOHN EMORY SIMMS *v.* STATE OF
MARYLAND

[No. 193, September Term, 1967.]

162

*Decided May 16, 1968.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Harper M. Smith* and *Kathryn E. Diggs* for appellant.

*H. Edgar Lentz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julian B. Stevens, State's Attorney for Anne Arundel County,* and *Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant, charged with the murder of Marguerita La-Sueur, was found guilty of murder in the first degree without capital punishment by a jury in the Circuit Court for Harford County and sentenced to imprisonment for life.[1]

The body of Marguerita LaSueur, an octogenarian resident of The Chase Home, a home for elderly women located in Annapolis, was found on the premises in a garden type tool shed on 18 August 1961 about 4:30 P.M. by the manager of the home. She was lying on the floor on her back, her right arm outstretched, her left arm almost to her side. Her dress was pulled up and her underpants were down below her knees. She had no shoes on; one shoe was under a table about two and a half feet away and the other was in an anteroom of the tool shed. There were several bruises and lacerations about her throat. There were stains on her slip and a fresh stain on the floor near her left leg. Near her right side was a broken pocket-type yellow comb. It was the opinion of the medical examiner that she died of manual strangulation. Autopsy findings included that material from the vagina was negative for sperm and prostatic secretion but scrapings from the leg were positive for such secretion. Wood chips from the floor boards containing the stain, the comb and the deceased's slip were sent to the F.B.I. Laboratory and an analysis made. Stains on the lower portion of the slip contained semen and a very small quantity of blood. The semen originated from a man who was a secretor [2] and that man belonged to Blood Group "A." The stain

---

1. The murder was alleged to have been committed on 18 August 1961 in Anne Arundel County. The prior history of the case is not relevant to the issues raised on this appeal but it appears that the case was first removed to Montgomery County and then to Washington County where the appellant was tried and convicted at a court trial with three judges presiding. An appeal was noted and while it was pending the appellant elected to avail himself of the relief afforded by the rulings in *Schowgurow v. State*, 240 Md. 121. He was again indicted on 10 February 1966 and the case was removed to Harford County where it came to trial on 3 May 1966, resulting in the above judgment.

2. An F.B.I. expert on the subject testified that persons are secretors or non-secretors. A secretor secretes into his semen, into

on the wood chips was also semen from a secretor belonging to Blood Group "A." The comb contained hairs. It was found that they had been artificially colored a red-brown and were of Negroid origin. These findings were communicated to the Annapolis Police Department by telephone on 23 August and by written report mailed on 25 August.

On August 27, 1961, about 1:00 A.M., Officer Wallace L. Forte of the City of Annapolis Police Department, while operating a police cruise car, received a call to go to 28 Shaw Street. When he arrived at that address a large crowd was there and he observed a woman lying on the porch. "She was bleeding from the head—top of the head—head wound. * * * I observed that she was very still; no motion at the time." He could not tell at that time whether she was conscious or unconscious but she "was very quiet and still." He called an ambulance and she was taken to the hospital. The officer ascertained that the woman's name was Grace Brown and that she lived in an upstairs apartment of 28 Shaw Street. He tried to find out what had occurred and received information from one of the persons on the scene that the appellant, who was then standing in the rear of the crowd, had gone to the upstairs of 28 Shaw Street. The officer approached the appellant and "noticed he had quite a good deal of blood on him." [3] He had "blood on his hands, forehead, edge of his hair and also his shirt and trousers." The officer asked the appellant "where he got the blood from" and the appellant stated that it came from his mother, that for "strangulization" he had taken her to the hospital. The officer checked with the hospital and again asked the appellant "where the blood had come from, since it had not come from his mother.

---

his saliva, into his perspiration and into his tears the same blood factors which he possesses in his blood stream. Thus a person belonging to Blood Group "A," if a secretor, will secrete group "A" blood.

3. At this point counsel for the appellant objected and moved to strike Forte's testimony. Counsel had made objection shortly after Forte began to testify at which time the court ruled the objection was premature but that it would entertain a motion to strike if the State did not show that the testimony was relevant. Upon the subsequent objection Forte's testimony was resumed out of the presence of the jury.

\* \* \* the answer from the hospital stated that the blood did not come from his mother." The appellant "then admitted that he had been up in Grace Brown's apartment \* \* \* he had gone up there with a box of shrimp for her and him to eat, and he observed Grace Brown lying in bed with her back to him and he stated he didn't know what came over him and made him do it, but he struck her in the head with this hammer." The officer placed the appellant under arrest. "I charged him then and there with assault and battery on Grace Brown and told him he was under arrest and called for another cruise car to take him to Headquarters." The appellant was booked about 2:00 A.M. on 27 August, remained in custody, was tried on an assault and battery warrant before a trial magistrate on 30 August and found guilty.

Lieutenant Bernard Kalnoske of the Annapolis Police Department was investigating the homicide of Marguerita LaSueur. On arriving at the police headquarters about 7:30 A.M. on 27 August he noted that the appellant had been booked and was in custody in the rear cell block. At that time he had received the information about the hair from the F.B.I. and remembered from an interview with the appellant on 23 August that he had a "reddish-type cast to his hair." About 8:00 A.M. the appellant was brought to the fingerprint counter in a hallway near the cell block. Kalnoske told the appellant that "we were getting hair specimens and saliva samples from all the suspects we had been interviewing in regards to the murder case. The appellant said something to the effect in regards, 'Are you trying to pin that murder on me?'" Kalnoske made a statement to the appellant "in regards to the purpose of the hair and saliva samples, for comparison with evidence that we had recovered at the scene of the crime \* \* \* that the evidence would be forwarded to the F.B.I. Laboratory in Washington." Kalnoske got a pair of scissors and envelopes and "demonstrated (to the appellant) the method in which we obtained the saliva sample." Kalnoske said, "I showed him how it was done, dropping a few drops of saliva on the paper, and then he done it \* \* \* He followed my example" and gave the saliva specimen. Kalnoske then cut off hairs from the front, back and sides of the appellant's head. The specimens were placed in envelopes and marked.

The appellant was standing while the specimens were taken and was not in restraint in any manner. Corporal Raymond Moreland of the Annapolis Police Department was present at the time the hairs and saliva were obtained. He said, although he could not give the exact words, that the appellant "willingly let Lt. Kalnoske take the hair samples and gave us the saliva sample * * * There was permission given by John Emory Simms to go ahead and take the hair samples, and he would give us the saliva sample." The hairs and saliva obtained from the appellant were sent to the F.B.I. Laboratory. The saliva was found to originate from a secretor who belonged to Blood Group "A." There was expert testimony that the semen on the wood chips and on the slip could have originated from the appellant. The hairs were of Negroid origin and artificially colored red-brown. They were compared with the hairs from the comb and were similar "under microscopic characteristics." It was the conclusion of the expert witness that the hairs found in the comb could have come from the appellant.

On appeal it is contended that the arrest of the appellant on 27 August 1961 was illegal and therefore the hair and saliva specimens were unlawfully obtained from him. He urges that the lower court erred:

1) in refusing to instruct the jury on the illegality of his arrest;
2) in admitting testimony regarding the hairs and saliva;
3) in admitting confessions "rendered involuntary and thus inadmissible where predicated upon a comparative analysis of specimens of hair and saliva obtained from" him illegally.

It is established that an arrest without a warrant is lawful where based upon a misdemeanor committed in the presence of the arresting officer. *Shelton v. State,* 3 Md. App. 394, 398. We think it clear in the instant case that the crime for which the appellant was arrested was not committed in the presence of the arresting officer.[4] But it has long been the rule in this State

---

4. The lower court found that the arrest was illegal "on the basis that no crime was committed, or was being committed in the presence of the arresting officer, no misdemeanor."

that a police officer may arrest without a warrant where there is probable cause to believe that a felony has been committed and that the person arrested committed the felony. *Boone v. State,* 2 Md. App. 479, 481. Probable cause in this context exists when the facts and circumstances within the knowledge of the arresting officer, or of which he had reasonably trustworthy information, are sufficient to warrant a reasonably cautious person in believing that a felony had been committed by the person arrested. *Michaels v. State,* 2 Md. App. 424, 428. "[T]he rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." *Edwardsen v. State,* 243 Md. 131, 136; *Terrell v. State,* 3 Md. App. 340, 359. In assessing the validity of an arrest under the rule the essential ingredient is that probable cause existed within the knowledge of the arresting officer and not that he necessarily construed that knowledge correctly. It is not the belief of the officer that determines the validity of the arrest; it is whether, in the situation in which he found himself, he had probable cause to believe a felony had been committed and that the person arrested committed it. We think untenable the proposition that an arrest based on probable cause becomes unconsitutional because the crime is inaccurately described by an officer or because the officer said the arrest was for a misdemeanor when there was probable cause to believe it was a felony. "To make constitutional questions turn on the term chosen by police officers to describe their activity * * * is to engage in a futile and unwarranted exercise in semantics." *Ralph v. Pepersack,* 335 F. 2d 128, 134 (4th Cir.). Nor do we think that the offense of which the accused is subsequently charged or convicted is controlling. Certainly if an arrest is made on probable cause that a robbery was committed, the fact that the accused was charged only with assault or having been charged with robbery and assault was convicted only of assault would not invalidate the arrest. As the court said in *Bell v. United States,* 254 F. 2d 82 (D. C. Cir.), cert. den. 358 U. S. 885, at page 86:

> "But this description given by the officer does not go to the question of probable cause. The question is not

what name the officer attached to his action; it is whether, in the situation in which he found himself, he had reasonable ground to believe a felony had been committed and that the men in the car had committed it. The situation was a sudden, unanticipated development. Suppose the officer had arrested these men upon belief that they had committed a housebreaking, but the legal lights in charge of preparing indictments had decided the offense was robbery; or suppose later information had disclosed a murder. Would the arrest have been invalid? Of course not. So to hold would make a mockery of the Supreme Court's admonition to us that probable cause is a matter of practicalities, not of technicalities."

In the instant case we believe that there was probable cause for the arresting officer to believe that a felony had been committed and that the appellant committed it. Assault with intent to murder is a felony. Md. Code (1967 Repl. Vol.), Art. 27, § 12. Intent is the essence of that felony and if the intent was carried out, the resulting crime would have had to be either first or second degree murder. *Marks v. State,* 230 Md. 108, 112. But a specific intent to murder is not a necessary element for conviction of assault with intent to murder. It is sufficient if there was an intention to commit grievous bodily harm. *Lawrence v. State,* 2 Md. App. 736, 738.

"The essential distinction between murder and manslaughter is the presence or absence of malice, which is the intentional doing of a wrongful act to another without legal excuse or justification. The inference of malice may be drawn from the fact of the use of a deadly weapon directed to a vital part of the body. *Chisley v. State,* 202 Md. 87, 95 A. 2d 577. The law presumes that in the absence of mitigation, all homicides are committed with malice and constitute murder. This presumption also applies to cases of assault with intent to commit murder." *Tate v. State,* 236 Md. 312, 317.

The arresting officer saw a woman lying motionless on the porch

bleeding from the head. He received information that the appellant had gone upstairs in the premises where the victim lived. He observed that the appellant, who was on the scene, had "a good deal of blood * * * on his hands, forehead, edge of his hair and also his shirt and trousers." There were reasonable grounds that the appellant's explanation of the presence of the blood on his person was untrue from information received from the hospital. Then the appellant said he went to the room of the victim and saw her lying in bed with her back to him. Although he did not know what came over him and made him do it, he admitted that he struck her in the head with a hammer. The admissions were not the result of a custodial interrogation of the appellant, who was accosted on the street by the officer and merely questioned as to his identity and actions. *Morgan v. State,* 2 Md. App. 440; *Gaudio and Bucci v. State,* 1 Md. App. 455. The observations of the officer and the admissions of the appellant constituted probable cause to believe that the appellant had committed the felony of assault with intent to murder. We hold that the arrest was valid.[5]

The finding that the arrest was valid would appear to dispose of the contentions of the appellant as they are predicated upon the illegality of the arrest. But, despite the legality of the arrest, if the obtaining of the hair and saliva specimens was in violation of his constitutional rights, the question is whether evidence regarding them would have been properly admissible.

We think it clear that the constitutional right of the appellant against self-incrimination was not violated by the taking of the specimens. "[T]he privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which

---

5. A certified copy of the warrant of arrest issued for the assault by the appellant on Grace Brown was admitted with regard to the consideration of the legality of the arrest. It was not alleged that it was invalid on its face and had it been issued prior to the time the hair and saliva specimens were obtained from the appellant he would have then been in lawful custody under authority of the warrant. However, there is no evidence as to when it was issued, although the record contains a comment of defense counsel that it was issued 30 hours after the arrest which would be subsequent to the time the specimens were obtained.

makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Schmerber v. California,* 384 U. S. 757, 764; 86 S. Ct. 1826, 1832. *Schmerber* held that blood test evidence, although an incriminating product of compulsion, was neither an accused's testimony nor evidence relating to some communicative act or writing by the accused and was not inadmissible on privilege grounds. 384 U. S. 765; 86 S. Ct. 1833. And it recognized that the privilege "offers no protection against compulsion to submit to fingerprinting, photographing or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." 384 U. S. 764, 86 S. Ct. 1832. See also *United States v. Wade,* 388 U. S. 218, 222, 87 S. Ct. 1926, 1930.

The question whether the taking of the hair and saliva specimens violated the Fourth Amendment guarantee against unreasonable searches and seizures presents a more difficult issue. In considering the question we must look to that part of the opinion in *Schmerber v. California, supra,* dealing with the search and seizure claim there made. 384 U. S. 766-772. Rejecting the claim that the self-incrimination clause of the Fifth Amendment requires the human body in all circumstances to be held inviolate against state expeditions seeking evidence of crime, the Court stated that such testing procedures as the drawing of a blood sample from the accused for the purpose of making a chemical analysis to determine the percentage by weight of alcohol in his blood "plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of that (the Fourth) Amendment." It would appear that the Court deemed such testing procedures to be searches because they "invade another's body in search of evidence of guilt" and are "searches involving intrusions beyond the body's surface"—"intrusions into the human body". But it said that the Fourth Amendment's proper function is not to constrain against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In this frame of reference it found that early cases suggest that the police have a right to search the person of the accused when legally arrested, to discover and seize the fruits or

evidence of the crime.[6] "The suggestion of these cases apparently rests on two factors—first, there may be more immediate danger of concealed weapons or of destruction of evidence under the direct control of the accused * * *; second, once a search of the arrested person for weapons is permitted, it would be both impractical and unnecessary to enforcement of the Fourth Amendment's purpose to attempt to confine the search to those objects alone." 384 U. S. 769. But it found that these considerations, whatever their validity in general, have little application with respect to searches involving intrusions beyond the body's surface. Therefore for evidence found by such a compulsory search to be admissible:

1) the search must be under authority of a search warrant based on probable cause ("a clear indication that in fact such evidence will be found"), unless the authorities might reasonably have believed that an emergency existed in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence;[7] and

2) the test to be performed on the specimens obtained must be a reasonable one;[8] and

---

6. This is the rule in Maryland. *McRae v. State*, 3 Md. App. 388; *Hutchinson v. State*, 1 Md. App. 362. Although we have found that the arrest of the appellant was valid and he was therefore legally confined, the obtaining of the specimens was in no event an incident of the antecedent legal seizure of his person. The specimens were taken some six hours after the arrest and the evidence sought was specifically with relation to a crime other than the one for which he was arrested.

7. In *Schmerber* the Court found that since alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system, there was no time to seek out a magistrate and secure a warrant.

8. Apparently the Court meant that the test should be able reasonably to provide the fact sought; i.e., in *Schmerber*, the degree to which the accused was under the influence of alcohol. It said that extraction of blood samples for testing is a highly effective means for such determination and that the blood test procedure has become routine in our everyday life. It did not decide whether, if an accused preferred other means of testing, such as the "breathalyzer test", on grounds of fear, concern for health or religious scruple, his wishes would have to be respected.

3) the search must be performed in a reasonable manner.[9]
The Court in *Schmerber* said, "Because we are dealing with intrusions into the human body rather than with state interference with property relationships or private papers—'houses, papers and effects'—we write on a clean slate." 384 U. S. 767-768. The cases in State jurisdictions, preceding *Schmerber*, dealing with a compulsory physical examination or test, have not considered the constitutional aspects of the question as they are considered in *Schmerber*. Some simply stated that no search and seizure was involved; others turned on the rule in effect prior to *Mapp v. Ohio*, 367 U. S. 643—that if the evidence offered is otherwise competent, it will be accepted without inquiry into its source; [10] others were dependent upon the degree of offense to conscience or sense of justice, represented, in the circumstances, by the procedure followed.[11]

In any event we need not decide whether the obtaining of the hair and saliva specimens in the instant case was a search for evidence of guilt by the invasion of the body—a search "involving intrusions beyond the body's surface." [12] The lower

---

9. In *Schmerber* the blood was taken by a physician in a hospital environment according to acceptable medical practices. The Court said it was not presented with the serious questions which would arise if a search involving medical technique, even of the most rudimentary sort, was made by other than medical personnel or other than in a medical environment—as, for example, by police in the privacy of the stationhouse.

10. In *Davis v. State*, 189 Md. 640, finding that the question of how evidence is obtained is collateral to the issue of guilt or innocence of the accused, the Court held that pertinent evidence, no matter how obtained, will be admitted, except as modified as to misdemeanors by statute. In this context the Court said, "There is no substantial difference between obtaining a specimen of blood from an accused and obtaining his fingerprints, or physical property, the possession of which by him is a pertinent question at issue in a felony charge against him." p. 646.

11. See Annotation, 25 A.L.R. 2d 1407; Annotation, 16 L. E. 2d 1338.

12. However, we do not think that the compelling of an accused to submit to fingerprinting, photographing or measurements, to write or speak for identification, to appear at a line-up, to walk, to assume a stance or to make a particular gesture are within the

court found that the obtaining of the specimens was with the consent of the appellant. There was before the lower court the testimony of Lt. Kalnoske that the appellant was vague as to his activities on 18 August 1961 when he saw him about 8:00 A.M. on 27 August. The appellant was not in his cell but at the fingerprint counter in a hallway. Kalnoske told him that they wanted to obtain hair and saliva samples from him.[13] The only response of the appellant was "something to the effect 'were we trying to pin the murder on him.' " Then Kalnoske explained to the appellant that they had some evidence from the murder and that a comparison would be made of the samples. He showed the appellant how to give the saliva sample, by "dropping a few drops of saliva on the paper" and the appellant, following that example, submitted the saliva sample. Kalnoske then selected hairs from the top, back and sides of the appellant's head and cut them off. Kalnoske said the appellant did not object to the police obtaining the samples, that neither he nor anyone present "exercised upon the body or person" of the appellant "any violence," or threatened him in any manner, nor made any promises to him. At the time the samples were obtained the appellant was standing, no one was holding him and he was not handcuffed. He had walked from his cell upon request, "he wasn't removed physically." Corporal Moreland, the only other person present when the specimens were obtained, testified that the appellant "willingly let Lt. Kalnoske take the hair samples and gave us the saliva sample." He could not recall the exact words which the appellant used to indicate his willingness but "there was permission given by John Emory Simms to go ahead and take the hair samples, and he would give us the saliva sample." Moreland said that neither he nor Kalnoske or any

---

ambit of *Schmerber*. We think it clear that such compulsions, in themselves, do not constitute a violation of the Fourth Amendment, and that *Schmerber* does not compel us to so construe them. It has been the law of this State since 1909 that the police may fingerprint, photograph and measure one held in legal custody as a proper exercise of routine police procedure. *Hall v. State*, 233 Md. 378; *Downs v. Swann*, 111 Md. 53.

13. Kalnoske said he was not sure whether he said "We'd like to get the samples" but he may have used those words.

other law enforcement officer threatened the appellant, nor made him any promises nor made any statements to induce him to give the specimens. The defense did not proffer any evidence on the matter. It appears from the record that at the trial objection to the evidence relating to the obtaining of the specimens was based on the illegality of the arrest and not on the alleged consent of the appellant. The appellant argues on appeal that by the totality of the circumstances, including that he was not informed that he was under no obligation to give the specimens or that they could be used to incriminate him, prohibits a conclusion that he voluntarily surrendered them. But as we have said, the privilege against self-incrimination is not applicable and so *Miranda v. Arizona,* 384 U. S. 436, is not controlling. *Morgan v. State,* 2 Md. App. 440. A search otherwise unlawful may be made with the voluntary consent of the accused. *Randolph v. State,* 1 Md. App. 441. The undisputed evidence before the lower court was that the appellant gave permission to the police to obtain the specimens and willingly permitted them to be obtained. See *Anderson v. State,* 237 Md. 45, 49. We think the question of the consent of the appellant was initially one of fact for the lower court to resolve and from the evidence before it we feel that the finding was not clearly erroneous. Md. Rules, 1086. See *United States v. Richardson,* 388 F. 2d 842 (6th Cir. 1968) ; *United States v. Page,* 302 F. 2d 81 (9th Cir. 1962). Cf. *Wilson v. State,* 239 Md. 245.

As we have found that the arrest of the appellant was valid and that he consented to the obtaining of the hair and saliva specimens, the lower court did not err, as contended, in refusing to instruct the jury on the illegality of the arrest, in admitting testimony as to the specimens and in admitting the confessions of the accused.

Two documents were submitted to this Court by the appellant in proper person. One was entitled "Supplement to Appellant Brief" and the other was entitled "Petition for Writ of Habeas Corpus (Dismiss Indictment)" which the appellant requested by letter be added to his direct appeal as a "supplemental brief." There is no provision in this jurisdiction for the filing of a supplemental brief. The points raised in the documents submitted by the appellant are not properly before us and,

except as to those also raised in the appellant's brief and hereinbefore disposed of, we do not consider them. *Fabian v. State,* 3 Md. App. 270; *Crossland v. State,* 2 Md. App. 722.

*Judgment affirmed.*