UNITED STATES of America,

v.

Joseph Carlo DE CICCIO, Defendant.

Cr. No. 45791.

United States District Court
E. D. New York.

Jan. 12, 1961.

---

Cornelius W. Wickersham, Jr., U. S. Atty., E. D. New York, Brooklyn, N. Y., for the United States; Henry Bramwell, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Jerome Lewis, Brooklyn, N. Y., for defendant.

BARTELS, District Judge.

█ Defendant, under indictment for violation of 18 U.S.C.A. § 472 [1], moves under Rule 41(e), Fed.Rules Crim.Proc., 18 U.S.C.A., to suppress certain evidence.[2]

Certain facts in this case are undisputed. On the evening of February 20, 1959, defendant and one Coppollo were under the surveillance of Detective Sergeant O'Connor and Detectives O'Brien and Walsh. While under such surveillance they were seen to enter the premises at 1655 Cropsey Avenue, Brooklyn, and shortly thereafter Coppollo emerged, looked about, and was joined by defendant. The two men began to walk away from the building and were followed by the two detectives on foot. The men then began to run and the detectives ran after them. A shot was fired and the men ordered to stop. Detective O'Brien apprehended defendant while Detective Walsh apprehended Coppollo. Asked what he had taken from the house, defendant replied that he had taken nothing, that he lived there, and invited the detectives to come to the house for verification. In defendant's house a search was conducted and forty-three counterfeit one-hundred dollar bills were found in a drawer in defendant's bedroom, in the folds of a shirt. No guns or stolen jewelry were found in defendant's home. After being taken to the 78th Precinct, defendant was turned over to Federal authorities.

The Government introduced the following testimony which was denied by the defendant. When the two men began to run, they threw some objects onto a lawn, and after physically stopping the flight of defendant, Detective O'Brien, while returning with defendant to the lawn, noticed a ring lying there. He questioned defendant about the ring, but defendant denied having seen it or throwing it away.[3] When the detective asked him if he obtained the ring from the apartment around the corner defendant said "No, I live there, come around and I will prove it to you. My wife is there". When he arrived at the apartment his wife was standing there and defendant turned to the detectives and said "Come in". After entering defendant's house Detective O'Brien asked defendant whether he had any more jewelry like the ring or if he had a gun. In reply defendant said "No, you can go look for yourself and see". The detectives also stated that defendant had not been handcuffed, was apprehended between 10 and 11 p. m. and had opened the apartment door him-

---

1. "Whoever, with intent to defraud * * keeps in [his] possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States * * * " [shall be punished].

2. The evidence herein, although obtained by New York City detectives, is subject to suppression if unlawfully obtained.

Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669.

3. After the search of defendant's home, the detectives returned to the same lawn and discovered two additional rings and two wrist watches. None of the items found on the lawn were listed as stolen or lost.

self. There was also testimony that the police records showed that defendant was arrested at 10:20 p. m. on February 20, 1959 and booked after midnight on the morning of the 21st. Special Agent Deckard of the Secret Service interviewed defendant the morning of the 21st, at which time defendant told him that the police asked if defendant had a gun and defendant told the detectives that he did not, and that they could search his apartment if they did not believe him. The testimony of Agent Deckard was not contradicted by defendant.

The testimony adduced on behalf of defendant differs from that of the detectives in several major respects. Defendant stated that he ran when he was followed because he did not know who the detectives were and having had an altercation with several men the previous night was apprehensive about being followed. He further testified that he voluntarily stopped when the shots were fired and was then grabbed, searched and handcuffed by one of the detectives who placed him in his car and drove him to the apartment; that he told the detectives that he lived in the house in question and when he arrived at the house, he met his wife and sister-in-law who were coming home and that both became excited on seeing the handcuffs; that his wife then opened the door and all of them walked into the apartment. In the apartment, according to the defendant, he asked his wife to produce utility bills to prove that he resided there, which she did; that he did not consent to any search but, instead, protested when the search was commenced and asked the detectives if they had a search warrant, to which they replied that they did not need one. He further testified that any bills found in his apartment had been "planted" there by the detectives. This testimony was corroborated by defendant's wife and sister-in-law to the extent that they met the defendant and the detectives outside of the building, that the wife opened the door to let them in and that no consent to the search had been given. The two last mentioned witnesses testified that the detectives arrived at the house with the defendant between the hours of 7 and 8 p. m. Defendant's wife further testified that there were no counterfeit bills in the apartment.

Detectives Walsh and O'Connor did not testify that they heard the conversation between Detective O'Brien and the defendant with respect to the jewelry and gun and the resultant consent to the search. Detective O'Brien's testimony in this respect, however, is corroborated by the testimony of Special Agent Deckard of the United States Secret Service to the effect that upon the morning following defendant's apprehension defendant made a statement to Deckard admitting that when the police questioned him as to a gun he denied possessing one and stated that "If you don't believe me you can take me to the apartment and search it", and he added that any counterfeit notes that were found in the apartment must have been planted there.

The testimony of defendant's wife and sister-in-law with respect to the time when the search took place is in conflict with the testimony of the detectives and inconsistent with the fact that the defendant was not booked until after midnight on the morning of the 21st. Moreover, the wife's statement that there were no counterfeit bills in the apartment and the defendant's testimony that the bills were "planted" at the time of the search is difficult to believe. Considering this testimony together with the admission that the defendant made to Special Agent Deckard the following morning leads the Court to conclude that the testimony offered by the Government is more credible than that offered by the defendant. The conduct of defendant in fleeing after being followed by the detectives and his action in discarding articles during the course of his flight gave the officers probable cause for his arrest upon suspicion of wrongful possession of the discarded items or of burglary. See Ellis v. United States, 1959, 105 U.S.App. D.C. 86, 264 F.2d 372; United States v. One 1951 Cadillac Coupe, D.C.Pa.1956,

139 F.Supp. 475; Pcn v. United States, 1 Cir., 1948, 168 F.2d 373, 374. The action by the detectives is not to be "measured by what might be probable cause to an untrained civilian passerby. When a peace officer makes the arrest the standard means a reasonable, cautious and prudent peace officer". Bell v. United States, 1958, 102 U.S.App.D.C. 383, 387, 254 F.2d 82, 86, certiorari denied, 1958, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113.

 The initial entry into the defendant's home was consensual. Once in the house the defendant informed the police that they could search the apartment and thereafter the bills were found in the defendant's drawer. Verbal consent alone however is not enough. There remains to be determined whether the consent given by defendant to the search was free and voluntary or whether it was induced by duress and coercion.[4] Defendant in this case was confident that no gun or jewelry, the express subject matter of the search, would be found. Therefore he had no fear of the result of the search. In this situation the Court believes that the consent given by the defendant was voluntary and freely given. If the testimony of the defendant were to be believed, he knew his rights because he said he demanded a search warrant. From all of the objective evidence the Court is of the opinion that defendant waived his constitutional right to refuse to submit to a search without a search warrant. In this circuit the Court has held that under such circumstances non-coerced consent to a search can readily be found. United States v. Dornblut, 2 Cir., 1958, 261 F.2d 949; United States v. Adelman, 2 Cir., 1939, 107 F.2d 497.

[4] Since a valid search was conducted, contraband found which was not the object of the search is nevertheless subject to seizure. Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. It is apparent that

"* * * When an article subject to lawful seizure properly comes into an officer's possession in the course of a lawful search it would be entirely without reason to say that he must return it because it was not one of the things it was his business to look for." Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 697, 4 L.Ed.2d 668.

The counterfeit bills were thus properly seized.

Motion to suppress denied. Settle order within ten (10) days on two (2) days' notice.

---

4. See United States v. De Vivo, D.C.N.Y.1961, 190 F.Supp. 483, and cases cited therein.