James Lee JONES, Appellant,

v.

C. C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.

William IPOCK, Appellant,

v.

C. C. PEYTON, Superintendent of the Virginia State Penitentiary, Appellee.

Nos. 12165, 12288.

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1969.

Decided June 2, 1969.

John D. Johnston, Jr., Durham, N. C. (Court-appointed counsel), for appellants.

W. Luke Witt, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, and Reno S. Harp, III, Asst. Atty. Gen. of Virginia, on brief), for appellee.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

SOBELOFF, Circuit Judge:

Appellants William Ipock and James Lee Jones were arrested "for being of ill fame for being night-prowlers"[1] in the circumstances detailed below. Shortly after the arrests, they were searched by the police and evidence was discovered incriminating them in a burglary the commission of which had not yet become known to the police. The ill fame or prowling charges were abandoned, but indictments for statutory burglary were returned. At their respective trials the inculpatory items were offered by the State and admitted over objection. Upon conviction they sought writs of error from the Supreme Court of Appeals of Virginia, which were denied.[2] They then instituted habeas corpus proceedings in

1. The pertinent sections of the Virginia statute are as follows:

19.1–20. Who are conservators of the peace; powers and duties.—Every judge throughout the State and every justice of the peace, commissioner in chancery, and county surveyor while in the performance of the duties of his office within his county or corporation shall be a conservator of the peace, and may require from persons not of good fame security for their good behavior for a term not exceeding one year. Every conservator of the peace shall arrest without a warrant for felonies committed in his presence, or upon reasonable suspicion of felony, and for breaches of the peace and all misdemeanors of whatever character committed in his presence.

19.1–21. Their duty, on complaint that a crime is intended; warrant.— If complaint be made to any such conservator that there is good cause to fear that a person intends to commit an offense against the person or property of another, he shall examine on oath the complainant, and any witness who may be produced, reduce the complaint to writing, and cause it to be signed by the complainant; and if it appear propper, such conservator shall issue a warrant, reciting the complaint, and requiring the person complained of forthwith to be apprehended and bought before him or some other conservator.

19.1–22. The proceeding when accused appears.—When such person appears, if the conservator, on hearing the parties, considers that there is not good cause for the complaint, he shall discharge such person, and may give judgment in his favor against the complainant for his costs. If he considers that there is good [cause] therefor, he may require a recognizance of the person against whom it is, and give judgment against him for the costs of the prosecution, or any part thereof; and, unless such recognizance be given, he shall commit him to jail by a warrant, stating the sum and time in and for which the recognizance is directed. The person given judgment under this section for costs may issue a writ of fieri facias thereon, if an appeal be not allowed; and proceedings thereupon may be according to §§ 16.1–99 through 16.1–101.

2. Ipock is serving a six-year sentence imposed in the Hustings Court of the City of Richmond, Part II, on January 3, 1967. The writ of error was denied him on April 26, 1967. Both at trial and on appeal, Ipock challenged the legality of his arrest and the constitutionality of the subsequent search and seizure, and he therefore has exhausted his state remedies. Edmondson v. Warden, Maryland Penitentiary, 335 F.2d 608 (4 Cir. 1964); Grundler v. North Carolina, 283 F.2d 798 (4 Cir. 1960), cert. denied, 362 U.S. 917, 80 S.Ct. 670, 4 L.Ed.2d 738.

Jones was convicted in the same trial court on February 28, 1967 and received a sentence of seven years. He was denied a writ of error on October 10, 1967. He too raised the search and seizure issue and has exhausted his state court remedies.

the District Court,[3] each unsuccessfully contending that the warrantless search which produced the incriminating evidence was unreasonable because the antecedent arrest was unlawful.

Because the two appellants raise an identical point arising from the same events, their appeals have been consolidated. In each instance the challenge is to the legality of the arrest and is predicated upon two alternative grounds. The appellants' position is that the statute under which the arrests were made is -void for vagueness, and further, that even if the statute is constitutionally valid the arrests were without probable cause. We agree with the latter contention and hold that writs of habeas corpus should issue.

I

The underlying facts are virtually undisputed. At approximately 6:30 p. m. on October 29, 1966, Detectives Boyer and Bernhard of the Richmond police force saw the appellants and another man walking in an area of Richmond which had recently been the scene of a number of burglaries. The officers testified that they were in an unmarked police car when they saw the two appellants and their companion proceeding north on Bainbridge Street. The detectives pulled into the parking lot of a Safeway store from which point they hoped to observe the three again. The store was open for business at the time. From the parking lot Boyer and Bernhard saw the appellants emerge from an alley and enter a car parked on the Safeway lot in which a fourth person was waiting. When this vehicle immediately departed from the lot, the officers followed.

It has been admitted that the officers then had no intention and no reason to arrest the occupants. After following for about 30 minutes, they lost the car in traffic. One of the officers claimed that during this surveillance the car drove through three or four gas stations without stopping; however, this testimony was somewhat contradicted by the other officer who stated the driver stopped in the stations but made no purchases. There is no evidence that the appellants or their comrades knew they were being followed, and therefore this is not a case in which evidence of "flight" may become an element in assessing whether the police had probable cause for making arrests.[4] Having lost sight of the vehicle, Boyer and Bernhard issued an all-unit broadcast, in which they said they wanted the men picked up for investigation only, not for arrest.

The next contact between the Richmond police and the appellants was almost five hours later, shortly before midnight. Detective H. L. Coleman, who had been assigned to the area which had been victimized by a series of burglaries, observed three men walking together who he thought answered the descriptions furnished in the all-unit broadcast by Officers Boyer and Bernhard. Coleman approached and briefly questioned them, asking their names and the reason for their presence there. Jones was unable to furnish identification satisfactory to Coleman, and Ipock and the other person apprehended gave Coleman names which were later determined to be false, but the falsity he did not then know. Receiving what he termed "conflicting stories" in answer to his questions, Coleman told the appellants he was arresting them for night-prowling.

At the suppression hearing Coleman admitted that the three men were walking on the sidewalk in orderly fashion,

3. Ipock's petition was dismissed on March 6, 1968 by the District Court for the Eastern District of Virginia, at Alexandria, while Jones' petition was dismissed on January 29, 1968 by the District Court sitting in Richmond.

4. The District Court, in dismissing Ipock's petition found that the auto in which Ipock was a passenger "eluded the unmarked police car that was following them." The evidence adduced furnishes no basis for this finding, as the Assistant Attorney General of Virginia frankly conceded in argument of the appeal.

not making loud noises or otherwise drawing attention to themselves. He further testified that the street was well-lighted and that a number of establishments in the area were open for business. After the arrests, Coleman called Boyer and Bernhard to the scene by radio, and they identified the arrested persons as three of the four seen earlier in the evening.

The police then searched the petitioners and seized some cash, a jacket and a penknife. The incriminating nature of these articles was discovered later. The State does not dispute the fact that the police were unaware of the occurrence of the burglary which became the basis of the prosecutions until the day following the arrests. As already noted, after the arrests for night-prowling and the searches, the prowling charges were not pressed by the authorities.

## II

■ We consider first the appellants' argument that the ill fame or night-prowling statute is unconstitutionally vague. The statute authorizes the requirement of behavior bonds for a term of up to one year from "persons not of good fame."[5] If the phrase "not of good fame" was without judicial gloss, we would readily agree that the statute is impermissibly vague, because "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). See Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). However, we have the benefit of a definitive construction of this statutory language by Virginia's highest court, whose construction must be ac-cepted in assessing the validity of the statute. In Fedele v. Commonwealth, 205 Va. 551, 138 S.E.2d 256 (1964), the Supreme Court of Appeals of Virginia reviewed a trial court's adjudication that the defendant was a night prowler who could be required to post a behavior bond. We note in passing that the proceeding was not a criminal prosecution, and was characterized by the appellate court as "quasi-criminal." The judgment was reversed upon the view that the evidence was insufficient to support the charge. In so holding, the court defined the statute's reach:

> The phrase "ill fame," as defined in Black's Law Dictionary, 3d ed., at p. 916, means "evil repute; notorious bad character." "Fame" has been held to be synonymous with "reputation." Harrison v. Lakenan, 189 Mo. 581, 88 S.W. 53, 58. Thus the phrase "ill fame," or "not of good fame," implies bad reputation.

> The word "prowl," as defined in Webster's Third New International Dictionary, at p. 1828, means "to move about or wander stealthily * * *; roam in search or as if in search of whatever may be found." A "prowler" is defined as "one who prowls." Thus it may be said that a "night prowler" is one whose habit is to move about at night for the purpose of committing some crime, or disturbing the peace, or doing some wrongful or wicked act.

> In Mayo's Guide to Magistrates, 1892, (Flournoy & Brown edition) at p. 532, under Title II, "Surety for Good Behavior," the author said that before a justice should require a party to find sureties for his good behavior under Code § 3912 (now § 19.1–20) "where no actual breach of the peace has been committed or is apprehended, that he should be satisfied by evidence on oath, *not only that the individual is not of good fame or reputation, but that his conduct and actions have been so*

---

5. It is doubtful whether an arrest without a warrant may be made under the statute. See §§ 19.1–21 and 19.1–22 quoted in fn.

1. However, our disposition of the case on other grounds makes it unnecessary to decide the point.

*scandalous as to justify his interference.* (Emphasis supplied by the court.)

The Supreme Court of the United States declared in Winters v. New York, 333 U.S. 507, 514, 68 S.Ct. 665, 669, 92 L.Ed. 840 (1948): "The interpretation by * * * [the Supreme Court of Appeals of Virginia] puts these words in the statute as definitely as if it had been so amended by the legislature."

The plain teaching of the Virginia Court in *Fedele* is that a person may not be required to post bond under § 19.1–20 merely because he has a "bad reputation." If this alone were to subject a person to possible penalty, the statute would unquestionably be unconstitutionally vague, for what is a "bad reputation" and from whose viewpoint is reputation to be judged? The difficulty these questions pose demonstrates the constitutional inadequacy of a statute penalizing "bad reputation" alone.

*Fedele,* however, expressly held that the statute comes into play only if it is shown that the accused is one whose "*habit* is to move about at night for the purpose of committing some crime, or disturbing the peace, or doing some wrongful or wicked act." (Emphasis supplied.) The word "habit" is defined in Webster's Unabridged Dictionary, 2d ed., as "a settled tendency of behavior." This is a rigorous standard, and we think use of this term by the Virginia court was deliberate and well advised. Recognizing the possibilities for abuse, the court interpreted the statute in a manner to preserve the rights of innocent persons who might fall within its scope if given an unduly broad application.

■ We assume for the purposes of this case that the court's narrow construction supplied requisite definiteness, gave fair warning of the activity in question and obviated the need for "men of common intelligence * * * [to] guess at its meaning," Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127 (1926), thus satisfying the demands of due process.[6]

### III

Assuming the statute's validity, it still remains to be determined whether there was "probable cause" for the arrests. The inquiry in this regard is whether in the totality of the circumstances at the time of the arrests the police had reasonable ground to believe that the appellants were "not of good fame" and were "night-prowlers" within the restrictive definition of the *Fedele* court. Manifestly the facts known to the investigating officers furnished an utterly insufficient basis for such belief.

■ Nothing in the circumstances would support a reasonable inference that the appellants were in the *habit* of moving about with wrongful purpose. The collective knowledge of the investigating officers was merely that the men had been seen at two different times on the same evening in an area in which there had been a number of burglaries. On this basis alone, the appellants were stopped by Officer Coleman.[7] On questioning them, he was dissatisfied with Jones' identification. This, however, was insufficient to elevate the circumstances to the level of probable cause. The fact that Ipock gave a name later found to be false is immaterial on the probable cause

6. The decision in Commonwealth v. Franklin, 172 Pa.Super. 152, 92 A.2d 272 (1952), is not in conflict with our assumption on this point. In that case, the Superior Court of Pennsylvania ruled that the practice of requiring acquitted defendants to post behavior bonds under a "not of good fame" statute was a violation of due process. In the course of the opinion, the court considered the question of the vagueness of the phrase and concluded that it was impermissibly vague.

As we have stated, this would be our view if the Virginia statute were to be tested on its face. See generally Amsterdam, "Federal Constitutional Restrictions on the Punishments of Crimes of Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like," 3 Crim.L.Bull. 205 (1967).

7. We express no opinion on the constitutionality of the "stop." We assume, without deciding, that it was lawful.

issue. In sum, when the arrest was made the investigating officers had no more than the barest unsupported suspicion that the appellants had acted or were about to act unlawfully. The arrests were therefore illegal, and for this reason the subsequent searches were in violation of the Fourth and Fourteenth Amendments to the Constitution.

In light of developments after the arrests there is a temptation to look upon these appellants and say, "but it did turn out that they are thieves, so why not let the searches and the convictions stand?" The Constitution takes a longer view; it looks beyond the immediate gain and considers the baleful results that would follow in the trail of judicial validation of illegal searches only because they are productive. Justice Jackson's statement in United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210 (1948) that "a search is not to be made legal by what it turns up" has become a truism of the law.[8]

██ If the rule were otherwise, then in the pursuit of the guilty, many innocent persons would be subjected to grave harassment. A free country cannot afford to indulge the theory that the apprehension of the guilty by any means whatsoever is justified, for that is the path to tyranny. Doubtless more violators would be captured, but at the expense of vast intrusions upon the liberty and privacy of guiltless persons as well— an unacceptable price in a free society. The Supreme Court's most recent pronouncement in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676, for example, is a plain reaffirmation of the established principle that summary arrests and searches on general suspicion, without warrants or probable cause, are intolerable even if in a particular instance such police behavior proves fruitful. The courts must with utmost firmness protect the constitutional rights of all, for if some are denied their rights today, others may be made to suffer the same deprivation tomorrow.

In accordance with our conclusion that unconstitutionally obtained evidence was introduced at the appellants' trials, we grant them writs of habeas corpus and order their release unless the Commonwealth elects to retry them within a reasonable time without the use of the tainted evidence.

Reversed and remanded with directions.

---

8. The eloquent concluding paragraph of his opinion for the Court is worth repeating here:

> We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them. The conviction based on evidence so obtained cannot stand. 332 U.S. at 595, 68 S.Ct. at 229.