**David Muriel MOSS**

v.

**J. D. COX, Superintendent of the Virginia State Penitentiary.**

**Civ. A. No. 5605–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

March 26, 1970.

James M. Lumpkin, Richmond, Va., for petitioner.

Robert Y. Button, Atty. Gen. of Virginia, Richmond, Va., for respondent.

## MEMORANDUM

MERHIGE, District Judge.

This is an application by a Virginia prisoner for a writ of habeas corpus.

On September 24, 1969, this Court dismissed the allegations of ineffective representation and interrogation without counsel, but held that the issue of the admissibility of certain marijuana, used in evidence in Moss' trial for possession of that drug, might have merit. A plenary hearing was ordered, and counsel was appointed to represent the petitioner.

At the hearing counsel for both parties stipulated to submit the factual issues for resolution on the trial record.

The arresting officer, Detective Whitaker, was present at the hearing, but both sides stated that his testimony nearly four years after the events in question, if added to his statements in the record of the trial on June 30, 1966, would probably not bring the Court any closer to the facts.

Moss was arrested on April 24, 1966, in the Greyhound bus station in Richmond, Virginia, along with one Hocker, by Detective C. Whitaker, Jr., of the Richmond Police. This was at about 8:00 p. m. About two hours earlier two Negro males had picked a billfold from the pocketbook of one Mrs. Howard at the Trailways bus station in Richmond, which is located about four blocks from the Greyhound station. Detective Whitaker had been advised of that larceny; the thieves had been described to him as "a colored male approximately five feet nine or ten, wearing a red sweater. The other was a colored male approximately five-ten or eleven, wearing a blue sweater." (Tr. 14).

Detective Whitaker testified that he was motivated to arrest Moss and Hocker by his observations of their behavior at the Greyhound terminal. His suspicions were aroused when he saw the two walking up to the buses that were boarding passengers:

> At first they were walking up to buses that was out on the dock. At that time I stood back and watched them, then they went inside the bus station and that was when David Moss picked up a newspaper and at that time—excuse me—at that time I walked up to them, approached them, and asked where they were traveling to. They said they weren't going anywhere, didn't have any tickets, so I asked why they kept approaching different buses that were loading on the dock, and that is when I told them that they were under arrest for ill-fame, to-wit, (unintelligible). (Tr. 14).

The men were charged with "ill-fame, to-wit, suspected of being pick-pockets". (Tr. 13). The trial court concluded, it

is plain from the record, that the arrest was predicated on the defendants' behavior as the officer observed it (Tr. 16).

On cross-examination the detective stated that the arrest of the two was, in effect, on suspicion:

> Q. Well, what did you suspect at that time?
>
> A. I suspected him of being possible pick-pockets.
>
> Q. Of what?
>
> A. Ill-fame, to-wit, possible pick-pockets.
>
> Q. Pick whose pockets?
>
> A. The way he kept approaching different buses, that's why I suspected him of being possible pick-pockets.
>
> Q. But whose pockets had you suspected him of picking?
>
> A. No one at that particular time.
>
> Q. Well, at the time after you had conducted your search and found nothing relative to any pick-pocket, was it your intention to release him?
>
> A. No, it was not.
>
> Q. What were you going to do then?
>
> A. I was going to carry the charge through and take it to Court.
>
> Q. And charge them with being a possible pick-pocket?
>
> A. Charge them with ill-fame.
>
> Q. To-wit?
>
> A. To-wit.
>
> Q. A possible pick-pocket?
>
> A. That's correct. (Tr. 21–22)

Even on redirect examination the officer would not respond to the suggestion that he had in fact arrested the petitioner and Hocker for the larceny which had been reported to him:

> Q. Officer, let me ask you this. You picked up these two because they fitted the description, I believe you testified, fitted the descrip-

tion of two persons you were looking for?

A. In other words, I picked them up because of the suspicion they were creating walking back and forwards to different lines (Tr. 27).

Detective Whitaker took the petitioner and his companion to his nearby automobile (Tr. 11), ordered them to stand leaning against the car, and began to search the two (Tr. 19). Hocker's left arm was handcuffed to Moss' right arm (Tr. 26). Whitaker stood between the two prisoners at this point (Tr. 26–27). He found a partly consumed marijuana cigarette on Hocker's person (Tr. 11–12). While he was running through Hocker's pockets, the detective saw the petitioner pull an unsmoked marijuana cigarette out of his pocket with his left hand and drop it on the ground (Tr. 12, 26–27). This was introduced at trial against Moss (Tr. 41–42). Moss was searched at headquarters, but nothing of interest was found (Tr. 23). The arresting officer stated on trial that when he talked with Hocker and the petitioner in the Greyhound station, it was not "affirmed in his mind" that these were the two who had been described in the bulletin about the larceny in the other bus station; this did not occur until they were taken to headquarters and put in a lineup (Tr. 15). The respondent's brief sets out the sequence of events:

The petitioner and his companion were taken then to a magistrate where warrants were obtained charging petitioner and Hocker with ill-fame. Because petitioner and Hocker matched the description broadcast earlier in the evening, a lineup was conducted at which time petitioner and Hocker were identified by the victim (see transcript of trial of June 30, 1966, pp. 64–70, 72, 90). Warrants were then secured for grand larceny. All of the above occurred within a period of two hours. After the seized objects were analyzed, warrants were then obtained for possession of marijuana.

One of the points asserted by Moss on direct appeal was the admission in evidence of the fruits of a search following an illegal arrest. The Supreme Court of Appeals of Virginia refused his petition for a writ of error on October 10, 1967; the exhaustion requirement has therefore been satisfied.

According to prison records supplied by the respondent, Moss is now in custody under a series of consecutive terms which do not expire until December 25, 1974. Although his sentence for the narcotics offense may, in the eyes of the Virginia authorities, have expired, he is still "in custody" under it for purposes of federal habeas corpus relief, Tucker v. Peyton, 357 F.2d 115 (4th Cir.1966).

Preliminarily this Court must determine whether a search or a seizure of which Moss can complain took place, for even if an arrest is illegal, the prosecution which follows is not for that reason constitutionally bad. White v. Peyton, Civil Action No. 5081, mem. decis. (E.D.Va., April 19, 1968).

Respondent contends that the marijuana that Moss discarded was at that point abandoned property, discarded in a public place, which an officer might observe and gather up without infringing upon anyone's rights. He cites McClure v. United States, 332 F.2d 19 (9th Cir. 1964); United States v. Zimple, 318 F. 2d 676 (7th Cir.) cert. denied 375 U.S. 868, 84 S.Ct. 128, 11 L.Ed.2d 95 (1963); and Jackson v. United States, 112 U.S. App.D.C. 191, 301 F.2d 515, cert. denied 369 U.S. 859, 82 S.Ct. 947, 8 L.Ed.2d 17 (1962).

This Court has concluded, however, that the petitioner has standing to complain of the introduction of the cigarette as the product of an illegal arrest. In Jackson v. United States, *supra,* the officer whose approach apparently prompted the defendant to jettison evidence from an automobile was acting quite legally in questioning the driver of

the car. In United States v. Zimple, *supra,* the defendant, in custody, failed in an attempt to discard evidence surreptitiously. The evidence was held admissible. The arrest and detention in that case, though, seems to have been unquestionably legal. United States v. Zimple, *supra,* 318 F.2d 679. In the instant case, the petitioner maintains that the arrest was illegal, and the respondent does not deny that the evidence came to light after Moss was in custody and when a search was imminent.

Property which is truly abandoned may well be subject to seizure without probable cause, at least in public places or in places which the movant had abandoned, or where he lacked standing for other reasons. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L. Ed.2d 668 (1960); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L. Ed. 898 (1924); Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, cert. denied 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968); Friedman v. United States, 347 F.2d 697 (8th Cir. 1965); United States v. Minker, 312 F. 2d 632 (3d Cir.1962); People v. Edwards, Cal., 80 Cal.Rptr. 633, 458 P.2d 713 (1969); State v. Chapman, 250 A.2d 203 (Me.1969). Such a seizure would not be unconstitutional, furthermore, merely because an arrest was made soon thereafter, and the arresting officer may well base his probable cause on his observations of an individual discarding some legally significant object. Jackson v. United States, *supra;* Trujillo v. United States, 294 F.2d 583 (10th Cir. 1961); Burton v. United States, 272 F. 2d 473 (9th Cir.1959); United States v. DeCiccio, 190 F.Supp. 487 (E.D.N.Y. 1961); Branning v. State, 222 So.2d 667 (Miss.1969). In such instances the legality of the arrest is irrelevant to the issue of the admissibility of evidence seized prior thereto. In all of these cases the officer was conducting himself in a manner to which the defendant had no right to object when the material was seized.

When the material which the defendant seeks to exclude came into the possession of the police subsequent to the arrest, however, the legality of the detention becomes quite relevant. A legal arrest carries with it the power to search the person of the prisoner and make use of the fruits to substantiate a criminal charge, Cf. Chimel v. California, 393 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), but at least the physical product of an illegal arrest, search and seizure cannot be used in state courts. Davis v. Mississippi, 394 U.S. 721, 89 S. Ct. 1394, 22 L.Ed.2d 676 (1969). To deny the petitioner standing to object to the evidence gotten in this case after his personal integrity had been violated by a possibly unconstitutional arrest and at a time when a search was imminent, as Moss could judge from the detective's treatment of Hocker, would be to indulge in a fiction. Just as consent to a search is invalid if it actually consists of compliance with official demands, Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), so abandonment of goods in the face of impending discovery does not preclude subsequent objection to whatever illegal conduct precipitated such action. The exclusionary rule is aimed at official improprieties. Quite in point is Williams v. United States, 99 U.S.App.D.C. 161, 237 F.2d 789 (1956):

> The arrest of appellant was illegal because without a warrant, without probable cause, and without other validating circumstances. The government does not seriously contend otherwise. A cigarette package containing capsules which in turn contained contraband narcotics was procured by the officers, who had appellant in custody, when he dropped the package in a corridor of the precinct station shortly after his arrest and when it seemed clear he was going to be searched. The contraband capsules were admitted in evidence. Since they were procured as a result of the illegal arrest the motion for their suppression made at the trial should have been granted.

Williams v. United States, *supra,* 789.

Moss, in the light of this decision, has standing to object to the introduction of what was on his person when he was arrested. Next to be determined is the question of the legality of the arrest.[1]

■ This Court is faced here with the thorny question of what law to apply. Unquestionably the requirements of the Constitution must be met, and just as surely any rules instituted solely in an effort to supervise the federal system will not apply in this challenge to a state conviction. The petitioner contends forcefully that the arrest was illegal under Virginia law, specifically because it was made without a warrant. This complex question of the relevance of state law of arrest came in for extensive examination in Lathers v. United States, 396 F.2d 524 (5th Cir.1968), where it was concluded that state laws governing arrest will not trigger a federal exclusionary rule in a case where a state officer has made an arrest for a federal offense. Subsequently, in Moll v. United States, 413 F.2d 1233 (5th Cir.1969), the same Court of Appeals determined that state doctrine would bear on the legality of an arrest made by a state officer for a state offense.[2] Both of these cases, of course, were direct appeals from convictions of federal crimes. Where the question of the legality of an arrest by a state official arises on certiorari or on application for a writ of habeas corpus, however, the rule seems to be that federal constitutional standards alone establish the test, Paige v. Potts, 354 F.2d 212 (5th Cir.1965), and that the arrest must meet the requirements of constitutional probable cause

alone. Of course state law determines the existence of the state conferred power to make an arrest. Where this issue arises, state law may be relevant. Lathers v. United States, *supra,* 396 F.2d 531. That this threshold determination is sometimes explicitly made and sometimes passed over without discussion may explain the occasional references to state law in habeas corpus cases. Morris v. Boles, 386 F.2d 395 (4th Cir. 1967), cert. denied 390 U.S. 1043, 88 S. Ct. 1640, 20 L.Ed.2d 304 (1968). Other decisions stress that only constitutional shortcomings in official conduct will be corrected on collateral attacks upon state convictions. Ralph v. Pepersack, 335 F.2d 128, 131 (4th Cir.1964), cert. denied 380 U.S. 925, 85 S.Ct. 907, 13 L. Ed.2d 811 (1965). At least when the highest court of the state whose law arguably is applicable has reviewed the question, federal inquiry into the lawfulness of the arrest under state law would seem foreclosed; the issue has been decided.[3]

Such conclusion is buttressed by the course chosen in Jones v. Peyton, 411 F. 2d 857 (4th Cir.1969), by the Court of Appeals in finding an "ill-fame" arrest illegal. The Court remarked, Jones v. Peyton, *supra,* 860 n. 5, that a warrantless arrest under the Virginia statute would probably violate state law, but based its finding of illegality on the lack of probable cause. This case, likewise, will be disposed of by the application of constitutional standards alone.

■ The facts known to the arresting officer in this case are insufficient to establish probable cause justifying an

---

1. Because the facts indicate that, when the questionable evidence was discovered, the petitioner had been taken some distance from the point where he was first stopped and handcuffed, and that the officer had commenced to run through the pockets of the petitioner's companion, this Court will not explore the legality of the "stop" alone.

2. Compare United States v. Ford, 363 F.2d 375 (4th Cir. 1966); United States v.

Hopps, 331 F.2d 332 (4th Cir. 1964); United States v. Gearhart, 326 F.2d 412 (4th Cir. 1964). In none of these cases was the choice of law decision dispositive of the result.

3. That this had not occurred may explain the comments in Ralph v. Pepersack, *supra,* 335 F.2d 135, concerning the compliance of arresting officers with nonconstitutional provisions governing the legality of the arrest.

arrest for "ill fame." A short citation from the *Jones* opinion establishes this:

[Fedele v. Commonwealth, 205 Va. 551, 138 S.E.2d 256 (1964)], however, expressly held that the statute comes into play only if it is shown that the accused is one whose *"habit* is to move about at night for the purpose of committing some crime, or disturbing the peace, or doing some wrongful or wicked act." (Emphasis supplied.) The word "habit" is defined \* \* \* as "a settled tendency of behavior."

\* \* \* The inquiry [here] is whether in the totality of the circumstances at the time of the arrests the police had reasonable ground to believe that the appellants were "not of good fame" and were "night-prowlers" within the restrictive definition of the *Fedele* court. Manifestly the facts known to the investigating officers furnished an utterly insufficient basis for such belief. Jones v. Peyton, *supra,* 861.

The same reasoning applies here. Nothing in the record indicates that Detective Whitaker had ever known or observed Moss to behave "wrongfully" or "wickedly" before the evening of the arrest, and his brief surveillance of the petitioner's conduct could have given no indication of the existence of a "habit." The arrest was unfounded, as one for "ill-fame."

The respondent contends, however, that the arrest was justified as one for larceny, and that the exclusionary rule ought not to come into play when an arresting officer has merely misnamed the offense. At any rate, the respondent says, the test of probable cause is an "objective" one, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and in making an arrest an officer is entitled to rely on the collective knowledge of himself and others in the police force, Smith v. United States, 123 U.S. App.D.C. 202, 358 F.2d 833 (1966).

██ To say that probable cause must meet an objective standard means only that subjective good faith on the part of an arresting officer will not establish probable cause; disinterested opinion must be brought to bear sooner or later. This is not to say that the actual purpose of the arresting officer is irrelevant.

Here Detective Whitaker testified that he was motivated to take Moss and Hocker into custody by the conduct he observed and considered suspicious. The respondent rejected the opportunity to expand upon the reasons and justifications for the arrest which Whitaker put forward on trial. From his testimony reproduced above, it is clear that the detective was operating on the basis of his own observations, not the information communicated to him earlier that evening. He suspected Moss and Hocker of picking pockets. But when asked point-blank whose pockets he thought had been picked, he stated, "no one at that particular time," (Tr. 21). Apparently the connection between these defendants and the larceny from Mrs. Howard which had been the subject of a police bulletin was not made until they arrived at headquarters (Tr. 15).

A number of cases hold that, when an officer has made an arrest on probable cause, the legality of the seizure is not vitiated by the officer's good faith error in naming the crime for which the defendant is held. Klingler v. United States, 409 F.2d 299 (8th Cir.1969); United States v. Frazier, 385 F.2d 901 (6th Cir.1967); Barnett v. United States, 384 F.2d 848 (5th Cir.1967).

\* \* \* [I]f probable cause exists to effect an arrest for the crime for which the arrest is actually made, then the defect in stating another reason for the arrest may not be of such significance as to require suppression of a subsequent confession.— Cf. Ralph v. Pepersack, [*supra*], 335 F.2d 136; United States v. Frazier, *supra,* 385 F.2d 904.

██ On the other hand, an arrest for one actual purpose may not be justified by reference to another possible purpose, Jones v. United States, 357 U.S.

493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); Bowling v. United States, 122 U.S.App.D.C. 25, 350 F.2d 1002 (1965). Compare Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966); McNeely v. United States, 353 F.2d 913 (8th Cir.1965). A line of cases, particularly in the Fifth Circuit, has developed establishing that an arrest is constitutionally defective when a defendant is taken into custody on a charge which is availed of as a device to gather further evidence of his participation in another offense.

Even assuming that constitutional probable cause existed for the offense which actually motivated the arrest, it has been held that the use of the arrest power by officers, operating under the impression that an arrest for that offense could not stand up, to apprehend a person on a sham or pretextual charge is so dangerous to interests of privacy and personal security as to call into play the exclusionary rule. Mills v. Wainwright, 415 F.2d 787 (5th Cir.1969); Manuel v. United States, 355 F.2d 344 (5th Cir. 1966); Bowling v. United States, *supra;* Staples v. United States, 320 F.2d 817 (5th Cir.1963); Collins v. United States, 289 F.2d 129 (5th Cir.1961). The officer's subjective intent and beliefs are quite crucial in these cases.

Here Detective Whitaker has clearly stated that at the time of his arrests he did not believe the petitioner or his companions were probably guilty of any particular larceny. He arrested them, quite explicitly, on suspicion. The clear import of his words is that he suspected that they had attempted to pick some pockets during his surveillance and arrested and detained them for further investigation.

Under the line of cases cited, such official conduct violates the Fourth Amendment. That the governing doctrine is constitutional rather than an aspect of the supervision by federal courts of federal investigatory agents or federal trials is evident in that the most recent decision, Mills v. Wainwright, *su-*

*pra,* ruled on a collateral challenge to a state conviction.

Ralph v. Pepersack, *supra,* is not to the contrary. That case involved an effort to suppress a statement secured during allegedly illegal detention and admitted in a state trial, an attempt which failed for independently sufficient reasons.

In *Ralph,* the Court said that "[i]nsofar as *Staples* may be read as indicating that an arrest on probable cause is rendered unconstitutional because it is termed an arrest for investigation, we do not choose to follow it," Ralph v. Pepersack, *supra,* 335 F.2d 135. But at other points the opinion clearly states that the arrest was actually effected by officers operating on adequate facts to establish probable cause, Ralph v. Pepersack, *supra,* 134, and that the Court would not question the detention simply because the reason was misnamed.

This case has much more in common with Mills v. Wainwright, *supra.* As in that case, the ill-fame charge here was used as an investigatory tactic to enable the authorities to pursue their theories of the petitioner's guilt of one or another larceny offense.

The function of the Court in this situation is to determine if the arrest was merely a sham or a fraud wholly unrelated to the crime for which probable cause existed to arrest the individual. * * * The facts foreclose any other conclusion but that Mills' arrest for vagrancy was illegal and unrelated to any offense of which there was probable cause to take him into custody. Mills v. Wainwright, *supra,* 415 F.2d 790.

▮ Probable cause was lacking for the charge of ill-fame, and the existence of probable cause to arrest either for the Howard larceny or other possible offenses likewise cannot justify the arrest, because of its pretextual nature. Therefore this Court will not explore the question of whether such charges could legally have grounded an arrest.

The fruits of the illegal detention should have been suppressed. The question of harmless error will not be explored because the prejudicial nature of the marijuana is so obvious.

An order consistent with the memorandum will be entered.