UNITED STATES of America

v.

Warnell VEGA, aka Skippy, et al.,
Defendants.

No. 70-CR-543.

United States District Court,
E. D. New York.

March 5, 1971.

Edward R. Neaher, U. S. Atty., E. D. N. Y. (Desmond J. O'Sullivan, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for the United States.

Gary R. Sunden, New York City, for Warnell Vega, aka Skippy.

Stephen R. Mahler, Forest Hills, N. Y., for Pedro Carew, aka Pedro Carus.

Edward S. Panzer, New York City, for Leroy Allen.

Howard Diller, New York City, for Antonio Flores, aka Tony Flores and Carmen Rivera.

Solomon Kaplan, New York City, for George Nathan, aka George the Italian.

Bobby Wyler, aka Robert Wyler, pro se.

Joseph I. Stone, New York City, for Robert Brown, aka Sonny.

William Kelly, New York City, for Clem Nash, aka Clarence Nash.

Albert Krieger, (Ivan Fisher, New York City, of counsel), for Nelson Rivera and Dalilah R. Reys.

Brill & Hochhauser, New York City (Maurice Brill, New York City, of counsel), for Louis Guridi.

Jerald Rosenthal, New York City, for Orlando Guridi.

Leon A. Milman, Brooklyn, N. Y., for George Colon.

Edmund Rosner, New York City, for Sylvester Moore, aka Live Wire Moore.

Mercorella & Kase, New York City (Kenneth Kase, New York City, of counsel), for John Tirado, aka Johnny Dynamite.

*Memorandum of Decision and Order*

MISHLER, Chief Judge.

This is a motion pursuant to Rule 41 (e) of the Federal Rules of Criminal Procedure for the suppression of intercepted telephone conversations and physical evidence consisting of heroin and cocaine seized on July 25, 1968, in front of premises 400 Central Park West, in the Borough of Manhattan, and cocaine seized in apartment 10B of said premises. The court held a hearing.

### The Facts

On July 23, 1968, Dominick Butera, a detective of the New York City Police Department assigned to the Bureau of Narcotics, executed an affidavit which, in effect, stated that he had one Enrique Mateus, a known seller of narcotics, under observation at the LeMarquis Hotel, 12 East 31st Street, in the Borough of Manhattan, City and State of New York and observed him in conversation with two other males and a female. That he "tailed" Mateus and the others to premises known as 3555 Bainbridge Avenue, in the Borough of the Bronx, and that Mateus and one of the males entered apartment 7A at those premises. The affidavit relates that the transaction was consummated on the morning of June 18 at the LeMarquis Hotel and the inference is strong that Vega had sold Mateus narcotics.

Later in the day, Mateus registered at the Seville Hotel and called telephone number 654–0186. Detective Butera further stated that a confidential informant advised him that he was in apartment 7A at premises 3555 Bainbridge Avenue and heard the defendant Vega speak from telephone number 654–0186 with reference to a sale of narcotics.

The affidavit states that the telephone number 654–0186 is listed in the name of Barbara Titus and a general conclusory statement is made indicating that the defendant Vega lived with Barbara Titus as "her common law husband" at the premises. No criminal activity is attributable to Barbara Titus. The affidavit indicates that the defendant Vega used the telephone to carry on his crimi-

nal activities involving the sale of narcotics.

Defendant Vega challenges the sufficiency of the affidavit on the ground that it fails to show probable cause and the information supplied is not current as of July 23, 1968. The court rejects these arguments.

The wiretap order was signed by a justice of the Supreme Court of the State of New York on July 23, 1968. It authorized the seizure of " * * * any and all telephonic communications transmitted over telephone number 654–0186, listed to Barbara Titus * * * for the purpose of obtaining evidence of the commission of violations of the Narcotic Laws of the State of New York and conspiracy to commit same * * *."

The tap was installed on July 24, 1968. On July 25, 1968, the defendant Vega called telephone number 222–3245 and had a conversation with a female concerning narcotics. Thereafter, the defendant Vega had a conversation with a caller who identified himself as Preston, later identified as Preston Washington. Vega and Washington arranged to meet at a bar and grill at 115th Street and 7th Avenue, known as the Moonlight Bar and Grill.

In the meantime, by inquiry of the New York Telephone Company, the detectives learned that telephone number 222–3245 was listed for apartment 10B[1] at premises 400 Central Park West.

The surveillance by four New York City detectives started at the Moonlight Bar and Grill. They observed Vega and Washington enter Vega's 1968 Buick. They drove to premises 400 Central Park West. Detective Meximo Jimenez took a post near apartment 10B and observed Vega and Washington enter the apartment. Vega opened the door with a key. Detective Jimenez observed that neither Washington nor Vega carried anything when they entered the apartment. After a few moments, both left the apartment. This time Washington held a brown paper bag.

Detective Jimenez entered the elevator with Washington and Vega and they descended to the lobby of the building. As they left the building, Washington observed Detective King and two other detectives and apparently suspected that he was facing arrest. He thereupon intentionally dropped the brown paper bag which he knew contained heroin and cocaine behind him and continued walking. Detective King picked up the brown paper bag, recognized that it contained heroin and cocaine, took both Washington and Vega into custody and returned them to the building. Detective King searched the person of Vega and Washington and a scuffle ensued as they resisted arrest. In the search, Detective King found a key ring with six keys on Vega.

Detective Jimenez pointed to the door at the entrance of apartment 10B as indicating that that was the door from which he had previously observed Washington and Vega exit. Detective King knocked at the door. Receiving no response, he tried the keys he had seized from Vega. The last key tried fit and the door was opened. The detectives looked through the apartment to see if anyone else was present. Finding no one, a detective then picked up a throw pillow from the sofa, found the cocaine, and seized it.

### The Wiretap Order

In Berger v. State of New York, 388 U.S. 41, 55–56, 87 S.Ct. 1873, 1882, 18 L.Ed.2d 1040, decided June 12, 1967, the Court found that Section 813–a of the New York Code of Criminal Procedure was "deficient on its face" since

[I]t lays down no requirement for particularity in the warrant as to what specific crime has been or is being

---

1. There seemed to be some confusion as to the precise apartment number. Detective Jimenez testified that the apartment number was 10W.

committed, nor "the place to be searched," or "the persons or things to be seized" as specifically required by the Fourth Amendment. The need for particularity and evidence of re-*liability in the showing required when* judicial authorization of a search is sought is especially great in the case of eavesdropping.

Pointing to the degree of particularity required and the failure of the statute to meet that degree, the Court pointed out that the statute requires the supporting oath or affirmation to describe " * * * the person or persons whose communications * * * are to be overheard or recorded and the purpose thereof." Discussing the constitutional infirmity of the statute, the Court noted (388 U.S. at 59, 87 S.Ct. at 1883):

> But this does no more than identify the person whose constitutionally protected area is to be invaded rather than "particularly describing" the communications, conversations, or discussions to be seized. As with general warrants this leaves too much to the discretion of the officer executing the order.

To meet the constitutional standards set forth in *Berger*, the State Legislature amended the Code of Criminal Procedure by adding Sections 814, et seq., which became effective September 1, 1967. Section 817 required that the application contain a showing of

> (iii) a particular description of the type of communications sought to be intercepted, and (iv) the identity of the person, if known, committing such designated offense and whose communications are to be intercepted.

Section 819 sets forth the form and content of the eavesdropping order requiring

> 2. The identity of the person, if known, whose communications are to be intercepted.
>
>    *     *     *     *     *     *
>
> 4. A particular description of the type of communications sought to be

intercepted, and a statement of the particular designated offense to which it relates.

Congress, recognizing the need in law enforcement for wiretapping and eavesdropping and Fourth Amendment limitations as interpreted by *Berger* and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510, et seq.), effective June 19, 1968. Senate Report No. 1097, published in U.S.Code Congressional and Administrative News, 90th Congress, Second Session, 1968, Vol. 2, at page 2161, listed eight constitutional standards which *Berger* found the New York statute failed to meet. Among them were:

> (1) Particularity in describing the place to be searched and the person or thing to be seized.
>
> (2) Particularity in describing the crime that has been, is being, or is about to be committed.
>
> (3) Particularity in describing the type of conversation sought.

18 U.S.C. § 2518(4) states, in part, as follows:

> Each order authorizing or approving the interception of any wire or oral communication shall specify—
>
> (a) the identity of the person, if known, whose communications are to be intercepted;
>
>   *    *    *    *    *    *
>
> (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates.

It appears to this court that the supporting affidavit demonstrated the right to seize telephone conversations between the defendant Vega and any third party which related to the possession, sale, distribution or concealment of narcotics. No showing is made for the seizure of the conversations of Barbara Titus, in whose name the telephone stood. Absent

proof that the defendant Vega used the telephone in his narcotics business, the Yet the subject order permits the seizing of all telephonic communications over telephone number 654–0186.

■ The court finds the order too broad and lacking in the particularity required by both the state and federal statutes.

*Use of the Pen Register and Decoding Device to Obtain the Location of Telephone Number 222–345.*

■ The interception of a telephonic communication means either the aural acquisition or recorded acquisition of a conversation.[2] The information therefore received from the Pen recorder which led to the location of telephone number 222–3245 was not an interception and is not affected by the holding of the invalidity of the order. United States v. Escandar, 319 F.Supp. 295, 304 (S.D. Fla.1970).

*The Search on the Sidewalk in Front of Premises 400 Central Park West, New York.*

■ The right to seize abandoned property is not dependent upon either probable cause or search incident to an imminent arrest. Moss v. Cox, 311 F.

Supp. 1245, 1249 (D.C.Va.1970). The evidence seized, however, is inadmissible against Vega since the seizure is not relevant to the issues. It is only when the relationship between Vega and Washington is shown that the evidence is pertinent. The illegally seized telephone conversations and the consequent observations at the Moonlight Bar and Grill and at 400 Central Park West are inadmissible. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963).

*The Search of Apartment 10B*

■ Based on what the detectives found in the seizure on the sidewalk and the observations of Detective Jimenez, the detectives had probable cause to believe that there were narcotics in apartment 10B. The warrantless search of a dwelling is permitted only within well defined exceptions. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Though more here is shown than was shown in *Vale* in that Washington was seen exiting the apartment with what subsequently proved to be narcotics, it still comes within the teaching of *Vale* and the evidence must be suppressed.

---

2. Section 814, par. 3 of the Code of Criminal Procedure defines "intercepted communication" as follows:

3. "Intercepted communication" means (a) a telephonic or telegraphic communication which was intentionally overheard or recorded by a person other than the sender or receiver thereof, without the consent of the sender or receiver, by means of any instrument, device or equipment, or (b) a conversation or discussion which was intentionally overheard or recorded, without the consent of at least one party thereto, by a person not present thereat, by means of any instrument, de-

vice or equipment. The term "content", when used with respect to a communication, includes any information concerning the identity of the parties to such communications, and the existence, substance, purport, or meaning of that communication. The term "communication" includes conversation and discussion.

18 U.S.C. § 2510(4) defines "intercept" as follows:

(4) "intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

*Admissibility of the Seized Telephone Conversations and the Physical Evidence Seized in the Two Searches against Codefendants.*

The aggrieved party [3] was the defendant Vega and

suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.

Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).

■ The illegally seized telephone conversations and the physical evidence would be admissible against the other defendants as the acts and declarations of Vega as a coconspirator. Since obvious prejudice would thereby result, the Government cannot offer the telephone conversations and the physical evidence at a trial in which Vega is joined with other conspirators. The evidence is, therefore, inadmissible unless the Government severs the proceeding against Vega.

### Conclusion

All the telephone conversations seized pursuant to the state court order signed July 23, 1968, the narcotics seized in front of premises 400 Central Park West, the narcotics seized in apartment 10B at 400 Central Park West, were unlawfully seized and are suppressed for use as evidence in this case, and it is

So ordered.

---

3. 18 U.S.C. § 2510(11) defines an "aggrieved person" as follows:

(11) "aggrieved person" means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed.

The court also finds that the possession of the key of the apartment indicated that Vega had a proprietary interest in it and therefore is an "aggrieved person."